## JENKINS v. STATE

[No. 276, September Term, 1964.]

452

*Decided April 29, 1965.*

The cause was argued before HAMMOND, MARBURY, SYBERT, OPPENHEIMER and BARNES, JJ.

*Russell J. White* and *H. Lee Allers, Jr.,* for appellant.

*Richard M. Pollitt, Special Attorney,* with whom were *Thomas B. Finan, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *James Owen Knotts, State's Attorney for Caroline County,* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

On February 1, 1963, the proprietor of a small neighborhood grocery store in east Baltimore was robbed after he had been brutally and sadistically murdered behind the meat counter of his store by being hit on the head with a soft drink bottle, stabbed repeatedly with a knife and having his head and face split by a meat cleaver. Two days later the police arrested the appellant, David Jenkins, also known as David Bladen, on the street near the store. Jenkins had formerly lived across from the store and had been a customer. The police, it would seem, had probable cause to believe the appellant committed the crimes, inasmuch as the record does not indicate that the legality of his arrest was challenged below and no point is made of it on appeal. Jenkins was placed in a cell in the Eastern police station thirty minutes after he was arrested. About an hour later, at four-forty-five p.m., he was taken to a room on the second floor and questioned by Sergeant Hirsch and Lieutenant Glover in the presence of five other policemen. Jenkins was given supper at six o'clock and took fifteen to twenty minutes, according to one police witness and from twenty-five minutes to a half hour, according to another, to eat it. After supper the appellant was again questioned until about ten o'clock when, after he made significant oral admissions, he signed a typed consent to the search of his home. The police went to the home

and after showing the consent to the woman with whom Jenkins was living, were admitted by her and allowed to search. About eleven-fifteen they brought back to the station house a blue jacket with the word "Patterson" on the back, a khaki "army-type" shirt, both with blood on them, and a hooded gray sweater, which they had found in Jenkins' room.

A route salesman had seen a man wearing a blue jacket with the word "Patterson" on the back in the grocery store an hour or so before the murder and remembered that the customer did not have all of the twenty-cent price of a box of soap powder and that, as a result, it was arranged between the man and the storekeeper to leave the box on the counter until the buyer returned with the full purchase price. The box of soap powder in a brown paper bag was on the counter when the police investigated the murder. The appellant was seen later in the day of the murder by members of his family with money in his possession.

The khaki army shirt had two buttons missing from its front. A button which matched those on the shirt had been found on the floor of the grocery store under the body of the murdered grocer, which was lying face up.

When the appellant was shown the jacket, the shirt, and the sweater, he told the police he was ready to give them a statement and he did so for about an hour, beginning at eleven-twenty p.m. Before he began the statement he was told by Lieutenant Glover that what he said must be free and voluntary on his part, that no one would make him any promises or harm him in any way and that "what you say may be used for or against you in the Criminal Court," and the appellant said he understood what had been told him and was still willing to tell what took place in the grocery store.

In the statement Jenkins said he told another man, one Cox, who "needed some money," about the grocery store. The man then said he was planning to rob the store. The appellant told him to wait and went in the store and "bought eight cents worth of some candy and bubble gum" (bubble gum was found by the police in the pocket of the blue "Patterson" jacket). He came out and Cox told him to keep a watch while he went in the store. When appellant, soon after, went back in the store,

Cox and the grocer were fighting. Appellant took money from the cash register. He saw Cox with a bottle in his hand at one time and with a knife in his hand at another, and a little later he saw Cox hit the grocer in the face with a meat cleaver. Jenkins had worn the khaki shirt and the hooded gray sweater. Cox had worn the blue "Patterson" jacket, which Jenkins had lent him. (Investigation and a lie detector test convinced the police that Cox had nothing to do with the murder or the robbery.)

Jenkins' statement was typed by Officer Cohen as Jenkins gave it. When it was finished, Jenkins read it—all of it aloud, said one police witness, enough of it aloud to show he could read and understand it, and the rest to himself, say others—made corrections, and initialled the corrections. He also initialled the beginning and the end of each page so that nothing could be added or deleted. He would not sign the statement in the customary places (at the end of each of the three pages of the statement), as the police requested but, after a while, did sign each page on the margin. The witnesses were sequestered and the three policemen who testified as to why Jenkins would not sign at the bottom of the pages were in substantial, although not identical, accord.

Lieutenant Glover testified Jenkins said: "I will wait until I sign it" and said nothing about an attorney. Glover's words, in part as to this, were: "He said he wouldn't sign but he did, on his own, sign the margin."

Officer Cohen, who typed the confession, said that when Jenkins was asked to sign at the bottom of the pages, he said he "didn't want to sign at that time." He said nothing about an attorney, "he just said he wanted to wait." He said Jenkins signed the margins of his own accord.

Sergeant Hirsch's recollection was that when he was asked to sign the confession Jenkins said he would wait before he signed it—that he "thought he should wait until he got an attorney." He did not ask for an attorney or seek the services of an attorney then or later, although he was given an opportunity to do so several times on succeeding days. The only request he made was that a Catholic priest be brought to him, and this was done. Hirsch's belief was that Jenkins was willing to certify as true what he had told police by signing on the margins, but

that he was not willing to formalize his statement as a "confession" by signing it at the end.

Jenkins was granted a change of venue and was tried in Denton before Chief Judge Carter and Judges Keating and Rasin and a jury. The jury found him guilty of first degree murder, without qualifying its verdict, and guilty of robbery. The sentences were death for murder and twenty years for robbery. The judges would not admit Jenkins' confession in written form because of his refusal to sign it in a customary fashion, but did permit Officer Cohen, who had transcribed it, to use the writing to refresh his recollection as to what Jenkins had said and to relate his statements and answers to the jury for their ultimate determination as to their validity and effect, under appropriate instructions.

On appeal Jenkins makes three contentions: first, the confession was improperly admitted; second, the search of his home and the seizure of his clothing was illegal; and third, the State did not meet the burden of showing him to have been sane at the time of the commission of the crime and at the time of trial.

Appellant does not claim that the police officers were not truthful or accurate when they testified that no force, duress or threats were used to obtain the confession or when they said that no specific promises of immunity were made to induce him to confess. Rather, he relies on the claims that because he had an I.Q. of but 67 and mild organic brain damage, can be easily led, has poor ability to read and spell (in the opinion of one psychiatrist), and was questioned for some nine hours by seven policemen, "the confession was not the product of an essentially free and unconstrained choice * * *" and "the totality of circumstances did not evidence an understandable admission of incriminating evidence."

There are a number of facts which together explain why the three judges and then the jury reasonably could have concluded, as the judge actually, and the jury in all probability, did, that Jenkins had freely and understandingly confessed. He was twenty-four years old. The doctors who testified at the trial said that many people with an I.Q. of sixty-seven can and do lead useful lives. Jenkins had gone through the ninth grade at school and, in the opinion of the doctors, had the intellectual

capacity of a sixth grade graduate. It seems unquestioned that Jenkins read aloud at least the first page of the confession and read the other pages to himself, and that he made several corrections, including the correction of a misspelled word, and initialled the changes. His capacity to resist being "easily led" was sufficient to enable him to refuse to confess from four-forty-five p.m. to eleven-thirty p.m. and, after he had confessed, to refuse to sign the pages of the confession as he was urged to do. It would also seem beyond question that the confession was made, not so much because he was weak, but because he was confronted with his clothing taken from his house, which he knew was identified with the crimes of which he was suspected.

The questioning was not unduly long or persistent or by relays of interrogators. It was interrupted by a supper break, one hour and a quarter after it began, and by the trip to the appellant's house that began about three and one half hours after questioning resumed after the supper break, the trip occasioning a cessation of questioning until eleven-twenty, when the confession began. The record indicates that only Lieutenant Glover and Sergeant Hirsch did the questioning.

The "totality of circumstances" here lends no more probability, if as much, to a conclusion that Jenkins' will was overborne than did the totalities in *Bean v. State,* 234 Md. 432, and cases cited, and in *Green v. State,* 236 Md. 334, in which claims of inadmissibility of confessions were rejected. See also *Hammond v. State,* 174 Md. 347; and *Taylor v. State,* 187 Md. 306.

Jenkins' second argument on the confession is that he was denied counsel while being interrogated and, therefore, for this reason alone, the confession was inadmissible. On the record it is plain and unchallenged that not until Jenkins had finished his confession and it was in typewritten form was there even mention of an attorney. If the confession was freely and voluntarily given, as the judges and the jury had a right to find from the testimony was the fact, it would not be made inadmissible under Maryland law merely because the confessor either was not warned of his constitutional right to remain silent or was without the advice of counsel, or both. In *Dyson v. State,* 238 Md. 398, we again so held, relying on some nine very recently

cited cases, all to the same effect, the earliest having been decided in 1962.

The admissibility of the incriminating admissions which Jenkins made before he mentioned that he would wait to sign the paper on which they were written until he talked to a lawyer was not destroyed because he decided after he had made them that he would like to retract them or to prevent their being used by refusing to sign them formally. As we pointed out in *Mefford and Blackburn v. State,* 235 Md. 497, *cert. den.* 380 U. S. 937, 13 L. Ed. 2d 825, we read *Escobedo v. Illinois,* 378 U. S. 478, 491, 12 L. Ed. 2d 977, to hold no more than that where the suspect "* * * has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent * * *," the accused has been denied assistance of counsel and his statement made without the advice of counsel is inadmissible against him at his trial. The facts of *Escobedo* are not the facts of this case. Jenkins did not ask for and was never denied counsel. He confessed without asking for a lawyer or speaking of a lawyer. In *Hyde v. State,* 228 Md. 209, 224, cert. den. 372 U. S. 945, 9 L. Ed. 2d 970, the suspect made an oral statement and was asked to write it out. After writing a part he stopped and said he would like an attorney before he finished. Chief Judge Prescott for the Court said: "Obviously, Hyde's early oral statements, as related by Officers Gietka and Sizemore and Lt. Hohman and made before any mention concerning counsel was made by Hyde were admissible."

Appellant's third argument in support of his first contention, which is that the statement of the police to the appellant before he began to make the confession which was transcribed, that "what you say may be used for or against you in the Criminal Court," amounted to an improper inducement because it could well have led him to believe he would be helped by the court if he confessed, is not only inherently unpersuasive but has been rejected by the cases.

In *3 Wigmore on Evidence* (3rd Ed. 1940), Sec. 837, p. 276, the learned author discusses the use by a police interrogator of the phrase "what you say may be used for or against you," pointing out that in England in the first half of the nineteenth

century the policy of almost total exclusion of confessions had gone so far that in three cases the use of the words "what you say will be used *for* you" was held to require exclusion of the ensuing confessions, and that these cases were overruled in 1852 in *Reg. v. Baldry*, 2 Den. Cr. C. 430, 169 Eng. Reg. 568 (Lord Campbell, C. J., Pollock, C. B., Parke, B., Erle and Williams, JJ.) and saying of the overruled cases: "* * * these rulings were repudiated and some check was thus put to the extravagant policy of exclusion." In *Baldry* the judges agreed explicitly with the views of the English text writer, Taylor, which can now be found in abbreviated form in 1 Matthews & Spear, *Taylor on Evidence* (11 Ed., 1920), Secs. 881B and 884; Baron Parke saying, at p. 574 of 169 Eng. Rep., that as to the three earlier English cases:

> "I confess that I cannot look at the decisions without some shame when I consider what objections have prevailed to prevent the reception of confessions in evidence; and I agree * * *, that the rule has been extended quite too far, and that justice and common sense have, too frequently, been sacrificed at the shrine of mercy."

Wigmore suggests, accurately it would appear, that the holding of the *Baldry* case is now generally the law in the United States. See *Commonwealth v. Dascalakis* (Mass.), 137 N. E. 879, relying on *Commonwealth v. Storti* (Mass., Holmes, C. J.), 58 N. E. 1021; *Roesel v. State* (N. J.), 41 Atl. 408, 413, 416; and *Osborn v. People* (Colo.), 262 P. 892.

It is certainly the law in Maryland. In *Hammond v. State, supra,* at p. 355, Judge Urner, for the Court, said:

> "Reference was made in the argument for the defendant to the recital in his confession of a warning that anything he would say might be 'used for or against' him, and certain Texas and early English cases were cited in connection with the suggestion that, because of the defendant's nervous condition and limited intelligence, the use of the word 'for' in addition to 'against' in the phrase quoted from the caution given

him might have induced him to hope for some resulting favor. The Texas cases were governed by a statute specifying the form of warning to be given before a confession is received, and it is frankly stated in the appellant's brief that, according to the later English rule, the use of the words 'for and against' in such a caution to the accused does not render his confession inadmissible. [*Reg.*] *v. Baldry,* 5 Cox, Cr. Cas. 523. The confession in the present case not only recites the warning in the form quoted, and admits the absence of any threats or promises, but also states that the defendant made the statement of his 'own free will.' Upon the evidence in the record we could not justly hold that the rulings as to the admissibility of the confession and the prior statement were erroneous."

See also *Green v. State, supra; Bichell v. State,* 235 Md. 395; *Bean v. State, supra.*

There is nothing in the record before us to require a departure from the controlling precedents. Jenkins does not claim that in fact he received the impression from what Lieutenant Glover told him that he might receive clemency in the future if he confessed, and, indeed, it is difficult to see how he could convincingly or plausibly make that claim. The meaning the words "for or against you" would seem necessarily to convey would be that if the statement was used in the criminal court, whatever in it which was exculpatory would help the suspect and whatever was inculpatory would hurt him. Any likelihood that the use of the word "for" would suggest that the giving of a statement would be helpful to the confessor, would be simultaneously offset by the use of the immediately following words "or against you," particularly since the phrase "for or against you" closely followed the statement that "no one will make you any promises." The effect which could be expected to be produced on the suspect would seem to be that if he tells the truth and the truth that hurts him is presented at the trial, the truth that helps him will also be presented.

There is no substance to appellant's claim that the search of his home and the seizure of his clothes was illegal and the con-

fronting of the appellant with the clothes during his interrogation was impermissible. There is nothing in the record to even hint that Jenkins did not freely give his written consent to the search and seizure. Since the appellant's clothing came into police hands lawfully, their use in persuading the subject to confess and as evidence at the trial was not contrary to law or improper.

The final contention of the appellant is that the State did not prove that he was sane at the time of the commission of the offenses and sane at the time of the trial.

*Bradford v. State,* 234 Md. 505, 510, decided by this Court on May 4, 1964, held that (1) a man is presumed to have been sane and responsible for his acts at the time he committed a crime until there is adduced proof of his inability "to distinguish between right and wrong and understand the nature and consequences of his acts as applied to himself" (the M'Naghten rule) sufficient to raise a doubt as to his sanity as defined in the minds of reasonable men ("Evidence of some undefined mental disorder or instability is insufficient proof to overcome the presumption of sanity"), and (2) when there has been offered proof of insanity so defined sufficient to overcome the initial presumption of the sanity of the accused the State must prove sanity, as well as the other elements of the offense charged beyond a reasonable doubt.

*Rowe v. State,* 234 Md. 295, decided by a divided Court on April 7, 1964, held among other things that the standard for determining sanity at the time of trial, as well as at the time of the crime, was that of the M'Naghten rule.

*Fowler v. State,* 237 Md. 508, decided February 11, 1965, held that the court should determine as a preliminary matter of law whether there has been offered evidence of insanity under the M'Naghten rule, sufficient, if believed, to raise a question in the minds of reasonable men whether defendant is or is not insane, and if there is sufficient such evidence the jury must be instructed that the burden is on the State to prove the defendant sane beyond a reasonable doubt. If the court finds the evidence insufficient to raise the question of defendant's sanity in the minds of reasonable men, the issue of insanity should be withdrawn from the jury's consideration.

The trial in the case before us took place in February 1964 so that the three judges and counsel did not have the benefit of the views of this Court on the law of insanity in criminal cases, substantive and procedural, established by the *Bradford, Rowe* and *Fowler* cases. The trial judges did not rule preliminarily, as a matter of law—at least not formally or on the record—as to Jenkins' sanity either at the time of trial or at the time of the crime but submitted those issues separately to the jury. They instructed the jury, both on the aspect of the appellant's sanity at the time of trial and his sanity at the time of the crime, foreshadowing *Bradford,* that every person is presumed to be sane and in order to rebut that presumption it is necessary that evidence be introduced sufficient to cause a reasonable mind to question whether he was sane and, if evidence to that extent has been introduced, the presumption is overcome, and the State must prove the defendant sane beyond a reasonable doubt. The court properly instructed that the M'Naghten rule was the test to determine sanity at the time of the offense.

Counsel for the State and for Jenkins did not take any exceptions to the court's charge on the point or request additional instructions and we find no prejudice to the appellant, either in the submission of the issues of sanity to the jury or in the instructions of the court, because we think the record makes it apparent that, as a matter of law, Jenkins did not offer evidence of insanity at the time of the trial or at the time of the offenses sufficient to overcome the presumption that he was sane at both times.

To show that he was insane, Jenkins offered the testimony of Dr. Lerner, a psychiatrist, who testified that he had talked to Jenkins for an hour and a quarter or an hour and a half on December 13, 1963, over two months before the trial, and that, in his opinion, the accused was not "well enough" to stand trial or assist in his trial "at that time." In response to questions from the court, Dr. Lerner limited his opinion of the inability of the accused to stand trial precisely, saying it was as of "* * * that time when I examined him." When asked if he could say whether Jenkins had been competent to assist in his defense and advise counsel yesterday, was today and would be

tomorrow, Dr. Lerner answered: "No, I can't—I can not. I would have to subject him to another examination." Dr. Lerner would not attempt to say that Jenkins now was or ever had been insane under the M'Naghten test, going only as far as to say that he had some doubt that he was sane at the time of the offense. He immediately qualified this by adding: "Under the canon of the Maryland State law, I am not sure one way or the other." Later, when asked specifically by Judge Rasin if the court correctly understood that Dr. Lerner "was unable to determine whether he [Jenkins] was or whether he was not" sane on February 1, 1963, the day of the crimes, Dr. Lerner answered: "Definitely, I am not able to determine that, Sir." There was no evidence of M'Naghten insanity, as required by the *Rowe* case, offered during the trial on the point of insanity now and no legally persuasive testimony on the point of insanity at the time of the offenses.

The staff at Clifton Perkins Hospital had advised the court that Jenkins was competent to stand trial and this was the view of Dr. Prado, Director of Forensic Psychiatry for the State of Maryland. The trial judges had, of course, observed Jenkins for the several days of the trial and had heard him respond to questions from his counsel and from them at various stages of the trial. In pronouncing sentence the court said to Jenkins that the jury had properly found him to be sane at time of trial and at time of commission of the crimes, and added: "You are not a stupid man. * * * We don't believe that's the situation. We don't believe the evidence bears that out or justifies that conclusion * * *" (referring to Jenkins' claims that he was illiterate and if not legally insane, very close to it).

It is not entirely clear whether the court thought the evidence sufficient to raise a doubt of sanity in the minds of reasonable men and, for this reason, submitted the issues of sanity to the jury, or whether the judges thought the law was that the jury must decide those questions. It may well have been the latter because the court's instructions, both on insanity now and insanity then, told the jury they should consider the facts adduced "* * * and if you believe that those facts, taken together, are sufficient to cause a reasonable person to question whether he is sane or not, then you would consider that the presumption of sanity had been overcome by that evidence."

466

Whatever the reason the issues of sanity went to the jury, the appellant was not hurt. In our view, there was not sufficient evidence of insanity to rebut the presumption of sanity and the issues of insanity now and then should not have been submitted to the jury. *Fowler v. State, supra; O'Connor v. State,* 234 Md. 459; *Bradford v. State, supra; Lipscomb v. State,* 223 Md. 599. See also *Dunn v. State,* 226 Md. 463; *Hyde v. State, supra.*

Jenkins received the full protection the law affords an accused. He was assisted in his defense before a jury by competent, conscientious and diligent lawyers. The record discloses the presiding judges were scrupulously careful in recognizing and enforcing his rights and the obligations of the State in the course of the prosecution. He had a fair trial, free from error prejudicial to him.

*Judgments affirmed.*