## ROBINSON *v.* STATE OF MARYLAND

[No. 72, September Term, 1967.]

202

*Decided March 7, 1968.*

*Motion for rehearing filed March 18, 1968; denied April 1, 1968.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN and SINGLEY, JJ.

*Franklin Somes Tyng* for appellant.

*Frank A. DeCosta, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Edwin H. W. Harlan, Jr., State's Attorney for Harford County,* and *Donald G. Smith, Deputy State's Attorney for Harford County,* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

Because the trial judge sentenced appellant to death he is entitled to have reviewed by this Court, rather than the Court of Special Appeals, his conviction of the crimes of double mur-

der, larceny and assault with intent to rape. Code, Art. 5, § 12 (1967 Cum. Supp.). The recital of what happened makes a gory story, almost as incredible as it is revolting.

Late in the afternoon of Friday, 2 April 1965, the bodies of Florence Bond, 48, and James Edward Bond, her brother, 46, were discovered on the kitchen floor of their home near Bel Air, in Harford County. Florence, naked from the waist down, was lying on her back. The medical examiner "found a multitude of stab wounds and incised wounds of her neck" one of which had opened the jugular vein. There were stab wounds which penetrated the abdomen, some of which were made after death. Spermatozoa were found "in her vagina and also, to a lesser degree, in her rectum." There were at least 22 stab wounds in the left side of Edward Bond's face and neck, one of which had opened his jugular vein. There were severe stab wounds in his chest and "a huge cut across the abdomen." There was a stab wound "through this opening into the liver." Some of these wounds appeared "to have been set after death." There was a "defense wound" on the palm of Florence's right hand and similar wounds on both of Edward's hands. A massive air embolism was the principal cause of death in each case. Edward's blood contained 0.28% alcohol indicating intoxication at the time of death. No alcohol was found in the blood of Florence.

Appellant, 26, a farm hand, was related by marriage to Florence and Edward. They knew each other well. Florence told her sister, Mary Berry, that appellant—she called him "Piggy" —had been at her house "for two mornings in a row" and that "she was afraid of him." Since childhood he has suffered from neurofibromatosis, a disease which manifests itself by the eruption of tumors requiring frequent surgical intervention. His older brother said his schooling had been interrupted periodically for the surgical removal of tumors on his face, that he "went only to the fourth grade * * * and finally left school at age 14."

Set forth below is the letter of Dr. John M. Hamilton, the superintendent of Clifton T. Perkins State Hospital (Perkins) to the trial judge:

"The Honorable Harry E. Dyer, Jr.
Judge
Circuit Court for Harford County
Court House
Bel Air, Maryland

                    RE: ROBINSON, William Carr
                         Hospital #1404

"Dear Judge Dyer:

"The above named patient was committed to our hospital on May 17, 1965, by an Order of your Court, for a pre-trial mental examination.

"In a letter to the Honorable Court, dated September 17, 1965, I indicated that our evaluation would be delayed because of the necessity for Mr. Robinson's undergoing major surgery at the University Hospital, because of a chest-neck mass which had to be removed. This surgery has recently been completed and Mr. Robinson has been returned to our hospital; and, we are now able to render our report to the Court.

"Since being in the Clifton T. Perkins State Hospital, Mr. Robinson has received a comprehensive psychiatric evaluation with psychological testing, social service investigation, electroencephalography and other pertinent clinical and laboratory studies. He was presented before a Medical Staff Conference, on September 14, 1965, at which time it was the unanimous opinion of our Medical Staff, and I concur, that Mr. Robinson is currently competent to stand trial. Two of the staff physicians giving opinions in this case, Doctors Michael J. Pescor and Juliette M. Simmons, felt that Mr. Robinson was of such mental capacity and reason at the time of the alleged offenses so as to be properly able to distinguish between right and wrong, and to know the nature and consequences of his acts as applied to himself; and, therefore, felt that he was responsible for his actions at the time of the alleged offenses. I do not concur in this opinion because of the

relatively severe pathology which our evaluation disclosed.

"I found Mr. Robinson to be suffering from a Chronic Brain Syndrome of Unknown Cause (in view of his long history of neurofibromatosis, it is quite possible that there has been an invasion of the brain and central nervous system by the neurofibromata though this is something that we have not unquestionably established) ; and, I found his intellectual capacity impaired to the extent that he now functions at the Moderately Defective level of intelligence, with a full-scale score of 56 on the Wechsler Adult Intelligence Scale. I have real concern that Mr. Robinson was able to appreciate the nature, quality and consequences of his acts at the time of the alleged offenses. It seems evident he had some appreciation that what he was doing was an illegal act but even this is on the borderline. I am, therefore, unable to agree with the members of the Medical Staff who gave the opinions of responsibility and it is my own personal opinion that Mr. Robinson was probably not responsible for his actions at the time of the alleged offenses in that he did not have the mental capacity or reason to appreciate the nature, quality or consequence of his acts at that time, because of the brain disease and mental deficiency from which he suffers.

"In view of the above opinions, we would appreciate it if you would make arrangements for Mr. Robinson's return to your custody, as soon as possible, since our evaluation has been completed. If there is any other information that you might require concerning our evaluation of Mr. Robinson's course in our hospital, please do not hesitate to request it of us.

Sincerely,
JOHN M. HAMILTON, M.D.
Superintendent

"cc: The Honorable Edwin H. W. Harlan, Jr.
Dr. Wilfried R. Freinek"

When Dr. Hamilton was produced as a witness on behalf of appellant he said:

"It is my opinion that at the time of the alleged offenses, Mr. Robinson was of such mental incapacity and reason so as not to be able to properly distinguish between right and wrong, nor know the nature and consequences of his acts as applied to himself."

Appellant was taken into custody on 7 April. He was transported to Maryland State Police Headquarters at Pikesville where he confessed to the murders and the larceny of $3.00 which was taken from Florence's pocketbook. His trial, before Dyer, J., and a jury, began on 28 February 1966. On 8 March the jury declared him to be sane at the time of trial and sane at the time of the alleged offenses. The jury, on the same day, also found him guilty of first degree murder without capital punishment in both cases, guilty of petty larceny, and guilty of assault with intent to rape, with no recommendation as to capital punishment. On 30 March, Judge Dyer imposed a sentence of 18 months in the larceny case and life imprisonment in each of the murder cases. Death by the administration of lethal gas was the sentence in the assault case.

We shall deal with appellant's 10 contentions in the order in which they were presented by his court-appointed counsel, stating such additional facts as may be necessary.

## I.

Appellant contends his conviction of the first degree murder of Florence was a felony murder based on Code, Art. 27, § 410 (Repl. Vol. 1967) which makes a murder committed in an "attempt to perpetrate any rape * * *" murder in the first degree. The doctrine of merger, he argues, precludes his conviction of assault with intent to rape, thereby nullifying the sentence of death. No decisions of this Court flatly supporting his contention are cited [1] but there are cases in other jurisdic-

---

1. It might be argued that in *Thompson v. State*, 230 Md. 113, 186 A. 2d 461 (1962), *Ledbetter v. State*, 224 Md. 271, 167 A. 2d 596 (1961) and *Lipscomb v. State*, 223 Md. 599, 165 A. 2d 918 (1960), we have affirmed convictions of both the felony and the felony murder. The question here presented, however, seems not to have been raised in those cases.

tions which seem to have adopted the general principle advanced by appellant.[2] So that appellant's contention can be considered in its proper context it is necessary to examine the instructions given to the jury by the trial judge. After having directed a judgment of acquittal of the charge of rape the trial judge instructed the jury, in part, as follows:

> "As to the crime of First Degree Murder, the Code of Maryland states, (Article 27, Section 407)—'All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of willful, deliberate and premeditated killing shall be Murder in the First Degree.'"

> \* \* \*

> "Our Code (Article 27, Section 410) also provides that 'All murder which shall be committed in the perpetration of, or attempt to perpetrate, any rape, sodomy, mayhem, robbery, burglary, shall be Murder in the First Degree.'"

> \* \* \*

> "Now to justify a conviction of Murder in the First Degree the Jury must find the actual intent, the fully formed purpose to kill, with enough time for deliberation and premeditation to convince them that the purpose to kill is not the immediate offspring of rashness and impetuous temper and that the mind has become fully conscious of its own design.

> "For a homicide to be 'willful' as required for a conviction of First Degree Murder, there must be a specific purpose and design to kill. To be 'deliberate' there must be a full and conscious knowledge of the purpose to kill. And to be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time; that is, time enough to be deliberate. It is not, however, necessary that deliberation and premeditation shall have been conceived or shall have existed for any particular length of time before the kill-

2. See for example, *Ronzani v. State*, 24 Wis. 2d 512, 129 N. W. 2d 143 (1964).

ing. If the killing is not the instant effect of impulse, if there is hesitation or doubt to be overcome, a choice made as a result of thought, however short the struggle between the intention and the act, the crime is sufficient to be characterized as deliberate and premeditated murder.

"The existence of the elements of willfulness, deliberation and premeditation so as to constitute the homicide of First Degree Murder must be determined on the facts of the case; but a homicide is presumed to be Murder in the Second Degree and the burden is on the State to show that the killing was willful, deliberate and premeditated, if the crime is to be elevated to First Degree Murder. On the other hand, since murder is the unlawful killing of a human being with malice aforethought, the law presumes in the absence of justification, excuse or some circumstances of mitigation that all homicides are committed with malice aforethought and so are murder, the burden being on the accused to show circumstances of alleviation, or excuse or justification to reduce the offense to Manslaughter."

Since there is an abundance of evidence to support a verdict of premeditated murder under § 407 of Article 27 we must reject appellant's presumption that the jury found him guilty of a felony murder under § 410. It is entirely possible, and we think it more than likely, that the jury's verdict reflects a finding that the murder of Florence was premeditated. They had before them, for instance, his own words (from the confession):

"* * * I turned around and came back down on Grafton Shop Road and knocked on Florence Bond's door. I asked if Eddie was home and she said no and I asked her for some and she said "no". Then we started wrasseling and she said she was going to give me some. And that's when I cut her and she was laying in the floor and Eddie came in and Eddie asked me what I was doing there. Then him and I got to wrasseling. Then I cut him. Then both was dead I went upstairs

and got three dollars. Then I come back down the steps then I shut the light out and went out the kitchen door."

They heard the medical examiner describe "the great variety of stab wounds * * * the defense wounds on the inside of her right hand * * * the bruises and scrapes about the body * * * [the wound which] penetrated into her abdomen" and which was inflicted *after death*. They could have concluded all of these wounds were sustained by Florence after she had consented to have intercourse with him.

In a case much like the case at bar, *Kier v. State,* 216 Md. 513, 140 A. 2d 896 (1958), we said:

"Even if the assault with intent to rape was not in this case, there would still be evidence to justify the trial court in reaching the conclusion, as they did, that the murder was deliberate and premeditated under the provisions of Section 407. As the court said in *Chisley v. State,* 202 Md. 87, 106: 'It is not necessary that deliberation and premeditation shall have been conceived or have existed for any particular length of time before the killing. Their existence must be judged from the facts of the case.' In that case this court held that the delay between firing a first and second shot was such evidence as justified a finding of deliberation and premeditation. See also *Faulcon v. State,* 211 Md. 249. This court said in the recent case of *Elliott v. State,* 215 Md. 152, 160: 'To be "wilful" there must be a specific purpose and design to kill. To be "deliberate" there must be full and conscious knowledge of the purpose to kill. To be "premeditated" the design must have preceded the killing by a sufficient length of time, even though short, to be deliberate.'

"An ornamental iron horse and a sword in its scabbard, both of which objects were marked with human blood, were found near the body. The brutal manner in which the victim was beaten about the face and head with these or other objects indicates a protracted period during which the assault continued. Then the

assailant procured and produced a butcher knife which he plunged into her body not once but twice. There was ample evidence to justify the trial court in its conclusion that the action of the appellant was wilful, that it was deliberate, and that it was premeditated.

"The court is irresistibly driven to the conclusion that there was sufficient evidence to justify the trial court in arriving at its verdict of murder in the first degree." *Id.* at 522-23.

Appellant cites, as supporting his contention, the recent case of *Green v. State,* 243 Md. 75, 220 A. 2d 131 (1966), where the trial judge found the defendant guilty of rape and common law assault. We held that the two crimes were not separate and distinct and that the facts used to establish the lesser offense of assault were essential elements in establishing the greater offense of rape, "and [it was said] thus the assault was merged into rape." *Id.* at 81. The State, on the other hand, points out that, in *Green,* we also said:

"Most jurisdictions, including Maryland, have abolished the common law doctrine of merger and the true test under the modern concept of merger of offenses, is whether one crime necessarily involves the other." *Id.* at 80.

What seems to be an inconsistency is merely the ambivalence of the word "merger." We think it was quite clear, in *Green,* that the crime of rape necessarily involved the crime of assault and we think it is equally clear, in the instant case, that the evidence supports a verdict of murder under § 407 and that none of the elements of assault with intent to rape are necessarily elements of premeditated murder under § 407. Whether any of the elements of assault with intent to rape are necessarily elements of a felony murder under § 410 is a question which, in these circumstances, does not require our consideration.

II.

Appellant next attacks the validity of the sentence of death. We shall discuss his reasons therefor in the order in which they appear in the brief.

### (a)

Appellant merely restates the merger argument. We have already pointed out, in section I, that it has no merit.

### (b) and (c)

Code, Art. 27, § 12, which deals only with the crimes of assault to carnally know a female child under 14, assault with intent to rob, assault with intent to murder and assault with intent to rape, reads, in part, as follows:

> "* * * every person convicted of the crime of an assault with intent to commit a rape shall be guilty of a felony and shall be punished with death * * * provided, however, that the jury before whom any person indicted for the crime of an assault with intent to commit a rape shall be tried, if they find such person guilty thereof, may add to their verdict the words 'without capital punishment' * * * *and in no case where a jury shall have rendered a verdict in manner and form as hereinbefore prescribed, 'without capital punishment', shall the court in imposing the sentence, sentence the convicted party to pay the death penalty or to be confined for more than twenty years in the penitentiary.*" (Emphasis supplied.)

Appellant contends the italicized language refers to the words "without capital punishment" which the jury added to their verdicts of murder in the first degree and that the jury, having rendered *"a verdict* in [the] manner and form as *hereinbefore* prescribed," any sentence for assault with intent to rape in excess of 20 years in the penitentiary was prohibited. Appellant is attributing to the word "hereinbefore" a connotation which cannot be sustained. Surely it does not relate to anything outside of § 12 and the only crime in § 12 which is punishable by death is assault with intent to rape. If we assume, however, that "hereinbefore" could refer to something elsewhere in Art. 27 one would expect it to be something "before" § 12. But the penalties for murder will not be found in Art. 27 earlier than § 413 and therein will be found precisely the same expression, viz., "and in no case where a jury shall have rendered a ver-

dict in manner and form as hereinbefore prescribed, 'without capital punishment,' shall the court in imposing the sentence, sentence the convicted party to pay the death penalty."

(d)

The death penalty, in the circumstances, says the appellant, constitutes the "cruel and unusual punishment" proscribed by the Federal Constitution and Maryland's Declaration of Rights. In passing, it should be noted, the appellant absolves the trial judge of any "passion, prejudice, ill-will or like unworthy motives." He insists, however, that the "sentence is grossly and inordinately disproportionate to the offense."

The verdict of the jury was certainly not the result of a mistake nor of a misunderstanding. Judge Dyer, as a part of his instruction, read § 12 of Art. 27 to the jury and, moreover, he made it very clear to them that their possible verdicts were:

1. Guilty of Assault with Intent to Rape.
2. Guilty of Assault with Intent to Rape *without Capital Punishment*.
3. Not Guilty of Assault with Intent to Rape but Guilty of Assault.
4. Not Guilty of Assault. (Emphasis supplied.)

Any lingering doubt that the jury knew what it was doing would seem to be dispelled by the colloquy which took place when the verdicts were announced:

"(The Clerk) As to Case Number 3,061, Assault with Intent to Rape, is he Guilty or Not Guilty?

"(The Foreman) If Your Honor please, is this two charges or one charge?

"(The Court) One charge unless you find Not Guilty of the more serious; then you could possibly find Guilty of Assault, but it's—

"(The Foreman) We had understood this was two charges, one Assault with Intent to Rape and Assault.

"(The Court) No, the smaller merges into the larger.

"(The Foreman) We have a decision then. Guilty of Assault with Intent to Rape.

"(The Clerk) Do you care to poll the Jury?

"(Mr. Tyng) Was there no mention—no recommendation on the last sentence, sir?

"(The Court) No recommendation on the last one?

"(The Foreman) No, sir.

"(Mr. Tyng) If Your Honor please, I move that the Jury be polled as to the last sentence—I mean the last verdict, pardon me."

\* \* \*

"(The Clerk) As I call your name, each stand and give your verdict.

"WHEREUPON, each individual juror was polled, the unanimous verdict being 'Guilty of Assault with Intent to Rape.' "

The contention that the imposition of the death penalty constitutes cruel and unusual punishment has been considered and rejected by this Court on other occasions. *Dutton v. State,* 123 Md. 373, 91 Atl. 417 (1914) and *Walker v. State,* 186 Md. 440, 47 A. 2d 47 (1946). In *Walker* it was said that "under our system the power to commute sentences resides in the executive." *Id.* at 445. It is appropriate and relevant, we think, to repeat what Chief Judge Hammond, for the Court, said in *Jones v. State,* 247 Md. 530, 534, 233 A. 2d 791 (1967):

"Although this Court and the Review panel lacked jurisdiction to review the appellant's sentence, Art. 11, § 20 of the Constitution of Maryland gives the Governor the 'power to grant reprieves and pardons' and under this provision and those of Code (1965 Repl. Vol.), Art. 41, § 120, many governors have commuted sentences. The court-appointed counsel for the appellant, who has so conscientiously and diligently sought to protect his client's interests, undoubtedly will find it appropriate to urge upon the Governor who has the power we lack as a basis for commuting the sentence to life imprisonment the various factors he urged upon us, such as the youth of the appellant, the views of the psychiatrists as to his deficiencies of character and emotion and his inability to have a review of sentence,

which he would have had if his conviction had occurred several months after it did." [3]

### III.

Appellant next contends it was error for the trial judge to let the jury learn that, in his opinion, the evidence established that "any statement taken from this defendant was a voluntary one of his own free will." After hearing testimony out of the presence of the jury the following transpired:

"(Court) * * * Now, is it appropriate for a ruling on the admissibility of this statement?

"(Mr. Tyng) If it has not been made, Your Honor, I would like to formally make an objection to the admission of any confession on the basis of the testimony given, whether it's oral or written.

"(Court) I'll overrule the objection and rule that in the Court's opinion, the evidence established is that any statement taken from this defendant was a voluntary one of his own free will.

"Bring in the Jury and let's resume the case.

"(Mr. Harlan) Your Honor, we have, also, a written statement. We go through the same procedure with that.

"(Court) I wouldn't think so, unless testimony develops that this was a day or so later or something.

\* \* \*

"(Mr. Tyng) May we approach the bench?

"(Court) Yes.

"(Discussion at the Bench)

"(Mr. Harlan) May it please the Court, I think the reporter should read the Court's statement just prior to the bringing in of the Jury.

"Thereupon, aforementioned statement of the Court (ruling on the admissibility of the statement) was read to the Jury by the Court Reporter."

\* \* \*

"All right, anything further?

---

3. Code, Art. 26, § 132, limits the right of review to persons "convicted of a crime after July 1, 1966." See also Maryland Rule 762.

"(Mr. Harlan) No, sir.
"(Court) Anything further, Mr. Tyng?
"(Mr. Tyng) No, sir.
"(Court) All right, then Court will stand adjourned
until ten o'clock tomorrow morning."

It will be observed that appellant did not object to the read-
ing of the court's remark to the jury, that he did not move to
strike it nor did he ask that the jury be instructed to disre-
gard it; moreover, one should bear in mind, at no time there-
after did he make any objection, file any motion to strike or
submit any request for an instruction to disregard the state-
ment. There was no request that the court cover the matter
in his charge to the jury. The court did not mention it in his
charge and appellant did not except to his failure to do so.
It was neither mentioned nor referred to in any succeeding mo-
tion, including the motion for a new trial. It was neither men-
tioned nor referred to in the arguments of counsel at the trial
nor in the arguments at the hearing on the motion for a new
trial. The question appears to have been raised in this Court
for the first time. We think, therefore, that the propriety of
communicating the court's expression of opinion to the jury
is not reviewable on this appeal. Maryland Rule 756, *Bennett
v. State,* 230 Md. 562, 568, 188 A. 2d 142 (1963).

Assuming for the sake of argument, however, that the ques-
tion is reviewable and assuming further that there was some
impropriety in allowing the jury to learn how the court felt
about it, we are not persuaded that appellant was prejudiced
thereby. A quite recent statement of the general rule will be
found in *Davis and Peterson v. State,* 1 Md. App. 581, 232 A.
2d 535 (1967), *cert. den.* by this Court 17 November 1967:

"Prior to admitting the statements, testimony as to
their voluntariness was first given before the trial judge
out of the presence of the jury and subsequently re-
peated in the presence of the jury.

"The admissibility of a confession is, preliminarily,
a matter for the trial judge. Conflicts in testimony as
to how the confession was obtained are to be resolved
in the first instance by the trial judge and if, after fi-

nally and independently resolving the issue of voluntariness against the accused, the trial judge admits the confession, the matter of voluntariness is finally determined by the jury. *Jackson v. Denno,* 378 U. S. 368; *Sims v. Georgia,* 385 U. S. 538; See 'Jackson v. Denno—Revisited,' by Justice William A. Grimes, Vol. 6, No. 3, Trial Judges Journal; *Smith v. State,* 237 Md. 573; *Hall v. State,* 223 Md. 158, 169-170. The procedure followed in the lower court was proper and we find from the record no basis for disturbing the conclusion of the trial judge or the jury." *Id.* at 585.

The only witness produced on behalf of the appellant was his older (32) brother. His testimony did not go beyond stating that the appellant did not complete any grades beyond the fourth and that he went to the Johns Hopkins Hospital about six times for surgery. It is immediately apparent that when Judge Dyer ruled appellant's statement to be "a voluntary one of his own free will" the State's evidence of "voluntariness" was uncontradicted. It is most unlikely, therefore, that the jury, on the evidence then before it, would have reached a different conclusion, even if the court's opinion had not been made known to them. It is significant, perhaps, that appellant seems not to have made thereafter any determined effort to persuade the jury that the statement lacked voluntariness.

## IV.

Appellant here contends the confession should not have been admitted into evidence. The evidence produced by the State in this connection shows that appellant was arrested at 6:30 a.m. on 7 April. The warrants were read to him and he was then taken to the Harford County jail. At 7:25 a.m. he was told that "he didn't have to say anything if he didn't want to, and if he did, it would have to be freely and voluntarily of his own free will, and anything he said would be used against him in court." Two deputies talked to him until 8:50 a.m. when he was asked if "he would be willing to take a 'Lie Detector Test.'" Appellant said he was willing. After having been given breakfast he was taken to State Police Headquarters at Pikesville. At 1:00 p.m., after he had been given lunch, he was told

by Sgt. Travers of the State Police that he was entitled to have a lawyer represent him "before answering any questions." Sgt. Travers explained the polygraph procedure. Appellant then signed a printed form containing a request that he be given the polygraph examination and releasing the State Police from all liability. He was told he would be asked questions "concerning the death of Florence and Edward Bond." Sgt. Travers then asked him to relate his "movements on April first, 1965." Appellant's statement was informative but exculpatory. Shortly thereafter, having indicated he wanted to make a change in the account of his activities, he told Sgt. Travers how he had murdered Florence and her brother. While he repeated his statement one of the deputies wrote it in longhand. After the statement was read to him appellant signed each of the six handwritten pages. Shortly thereafter he signed a typewritten copy of the statement. The polygraph examination was not given.

The only conflict developed by the evidence concerns the extent of appellant's schooling. In his statement he said he completed the 10th grade at Central Consolidated School. As already noted his brother testified he went only as far as the fourth grade and quit school altogether when he was 14. This single disparity of fact seems to us to be without significance. Appellant did not himself take the witness stand to contradict any of the State's evidence nor was he ever heard to say that he was coerced, tricked or beguiled into acknowledging his guilt. Nevertheless, counsel for appellant characterizing him (I.Q. of 56) as a near "imbecile or moron" (I.Q. of 50), and as being "feeble minded and suggestible with no more intelligence or experience than a child" argues that his "will was overborne," that he would have agreed with anyone as "kind and understanding" as the police were to him. That we rejected a similar contention in a case much like the instant case, *Jenkins v. State,* 238 Md. 451, 209 A. 2d 616 (1965), persuades us that appellant's contention must likewise be rejected.

Appellant insists he comes within the ambit of *Miranda v. Arizona,* 384 U. S. 436 (1966) despite the fact that he was tried before *Miranda* was decided. *Johnson v. New Jersey,* 384 U. S. 719 (1966). We have consistently refused to apply *Miranda* to trials which took place before its effective date (13

June 1966) and we see no reason, in these circumstances, for receding from that position. *Westfall v. State,* 243 Md. 413, 221 A. 2d 646 (1966) ; *Campbell v. State,* 244 Md. 363, 223 A. 2d 604 (1966) ; *Young v. Warden,* 245 Md. 76, 224 A. 2d 842 (1966).

## V.

Appellant charges reversible error was committed when the court, after refusing a judgment of acquittal on the charge of larceny, permitted its determination by the jury when the only basis for a conviction, according to appellant, was his "naked and uncorroborated extra-judicial confession." We disagree. We think there was circumstantial evidence sufficient to provide the corroboration necessary to sustain the extra-judicial confession. There was, for example, undisputed testimony that Florence, at 9:20 p.m., shortly before she was murdered, had 29 dollars in her pocketbook. The following afternoon Deputy Comes saw "a lady's purse on the bed which was open and all of its contents [except the money] were lying on the bed." A finger print found on a cologne box, in the bedroom, was positively identified as belonging to appellant. Cf. *McNeil v. State,* 227 Md. 298, 176 A. 2d 338 (1961). The penknife found on the kitchen floor, established as being the murder weapon, was shown to belong to appellant. Howard Dorsey, who had agreed to take appellant home, left Bel Air with him "around 9:30." He said appellant asked to be let out at a point about ¼ of a mile from his home but quite near the Bond home. On 5 April blood stained items of clothing belonging to appellant were found in a barn near the home of his parents where he lived.

## VI.

On 17 May 1965, at the request of his counsel, the trial judge committed appellant to Perkins for a determination of his sanity. On the same day appellant filed the special plea authorized by Code, Art. 59, § 7, alleging "that he was insane or lunatic at the time of the commission of the crime, offense and misdemeanor alleged in the indictment." On admission to Perkins he was interviewed by Dr. Juliette Simmons, one of the staff psychiatrists. He was assigned to Ward 4 which was under the supervision of Dr. Simmons. She had 8 or 10 conversations

of 10 to 15 minutes duration with him. Additionally she had access to all material which had been accumulated on his chart and with which she had become familiar. At the Staff Conference she presented her opinion which was that appellant "was responsible at the time of the alleged offense and * * * [was] competent to stand trial." At that time she had not seen the autopsy report. After reading it, however, she did not change her opinion. At trial, in response to questions by the State, she testified appellant "did have the mental capacity to understand the difference between right and wrong, and the nature and consequences of his acts, as applied to himself." Asked to give the reasons for her opinion she answered:

"On Page 5 of our Staff Conference he was questioned about whether the victim was dead or alive at the time of sexual relationship with her, and it says, 'She wasn't dead at the time you were having sexual relationship with her?' and he answered, 'No.' Therefore, it was my feeling that he was aware of what he was doing, and was not doing something at that time that he had no emotional reaction to or physical awareness of. The—He did state that he came there to the house, knocked on the door, questioned whether anyone was at home with the female victim, and when she told him no, he came on into the house and asked her then to have sexual relationships with him, at which time, she reportedly refused. And then the patient struggled with her, and she was stabbed by Mr. Robinson. Then following all of this, with the brother entering and Mr. Robinson being fearful, attacked the brother, and then very methodically went upstairs, did take money from the purse of the female victim, put out the lights, left, went home, went to bed, buried —hid his clothes the following day. All of these acts and the sequence thereof, in my opinion, certainly do not appear to be the acts of someone who is unaware of their actions or unaware of the consequences of the act that they have committed. This man does have mental deficiency, mild or moderate, yes, I agree with

that. This man does have what we call a Chronic Brain Syndrome."

Next questioned as to what information had been available to her in respect of appellant's sexual activity prior to his entry into Perkins, quoting from the notes of Dr. Jan (another staff psychiatrist), she said:

"That his sexual life was normal, that he had dated twenty to thirty different girls, and had had sexual contact with about fifteen girls, and there was no history of homosexual tendencies and the patient denied any sexual deviation."

Appellant contends Dr. Simmons' testimony was inadmissible because it amounted to a violation of the doctor-patient privilege and because it related statements made by him at a time when he had not been advised of his rights in respect of self-incrimination.

Prior to the enactment of Code, Art. 35, § 13A (effective 1 June 1966) communications made to medical men in their professional capacity were not privileged. *O'Brien v. State,* 126 Md. 270, 284, 94 Atl. 1034 (1915); Rappeport, *Psychiatrist-Patient Privilege,* 23 Md. L. Rev. 39 (1963). While the statute does, with some exceptions, extend privilege to communications between patient and psychiatrist it would not, in any event, have been applicable to the instant case. Subsection c reads, in part, as follows:

"(c) There shall be no privilege for any relevant communications under this section * * * (3) in all proceedings, whether civil or criminal, in which the patient introduces his mental condition as an element of his claim or defense * * *."

Appellant's special plea of insanity would have made the statute inapplicable, therefore, even if his trial had taken place after 1 June 1966.

Although other courts have held that a psychiatrist may not testify in respect of confessions made to him by a defendant, *State v. Myers,* 220 S. C. 309, 67 S. E. 2d 506 (1951), that

juries must be instructed that such testimony can be considered in the determination of sanity only, *State v. Whitlow*, 45 N. J. 3, 210 A. 2d 763 (1965) and *In re Spencer*, 46 Cal. Rept. 753, 406 P. 2d 33 (1965), that the issues of sanity and guilt must be tried separately,[4] *State v. Raskin*, 34 Wis. 2d 607, 150 N. W. 2d 318 (1967), this Court has never had occasion to consider the matter. The statute, Code, Art. 59, §§ 7, 11 and 43, pursuant to which the examination of appellant was conducted, makes no mention of the problem. It simply authorizes mental examinations. But in *Hamilton v. State*, 225 Md. 302, 307, 170 A. 2d 192 (1961), we said:

> "The basic purpose of these code sections (7 through 12) is and has always been paternalistic in nature. As was said by this Court in *Deems v. State*, 127 Md. 624, 627, 96 Atl. 878 (1916), the purpose of this legislation is 'to protect an offender who is mentally incapable of forming a criminal intent from being punished as if he were sane, and to insure for him the custody and treatment best suited to his unfortunate condition.' "

What was said in *Hamilton, supra,* seems to suggest that statements made during a mental examination, "paternalistic" in purpose, ought not be admitted into evidence. In *Ramsey v. State*, 239 Md. 561, 564-65, 212 A. 2d 319 (1965), however, speaking through Chief Judge Prescott, we said:

> "Appellant first contends that he was denied due process of law because one of the State's witnesses referred in his testimony to other crimes with which

---

4. In *McCracken v. State*, 2 Md. App. 716, 720, decided 11 January 1968, the Court of Special Appeals said: "We think it logically follows that it is preferable that such evidence [of sanity vel non] be adduced out of the presence of the jury to avoid any possible prejudice and to obviate the necessity, when the evidence is found to be insufficient, of instructing the jury that the issue is not before them and that they are to disregard such evidence in their deliberations of whether the State has proved the commission of the crime beyond a reasonable doubt." At this time we express no opinion as to the desirability of such a procedure.

appellant had been charged, and another State's witness, a psychiatrist, mentioned that appellant told him that he had confessed to the commission of the offense for which he was being tried, but the confession was untrue."

\* \* \*

"The reference of the psychiatrist to the effect that appellant had told him that he had confessed, if error, was harmless. The psychiatrist immediately stated that defendant told him the confession was not true, and the confession, itself, was later properly introduced into evidence."

In the case under consideration, it will be recalled, the testimony of Dr. Simmons was produced *after* Sgt. Travers related appellant's oral statement, *after* the confession was admitted into evidence, and *after* the testimony of Dr. Hamilton and of Mr. Oropallo, the Perkins psychologist. Dr. Simmons' testimony brought forth nothing new except, perhaps, her statement that appellant had said Florence was alive when he had sexual relations with her. Appellant's present contention is aimed both at that statement and her statement in respect of his prior sexual activity. The thrust of his argument, of course, is that Dr. Simmons' testimony attenuates his claim that he is a necrophiliac and, therefore, insane. In our judgment, the record not only does not support a finding of necrophilia, it does not support a finding of any kind of sexual deviation. As Dr. Simmons observed, necrophilia (an erotic attraction to corpses) is a neurotic rather than a psychotic illness and a necrophiliac can be and usually is a responsible agent, aware of what he is doing. Dr. Simmons also said appellant told her that if Florence "had submitted, he would not have killed her." If there was any error in the admission of Dr. Simmons' testimony, it was harmless.

## VII.

The contention here is that appellant was denied a preliminary hearing. In *Kardy v. Shook, J.,* 237 Md. 524, 542, 207 A. 2d 83 (1965) we held that if an accused is promptly indicted, the fact that a preliminary hearing is not held does not

transgress any of his rights. See also *Ferrell v. Warden,* 241 Md. 432, 216 A. 2d 740 (1966). Appellant was arrested on 7 April 1965. He was indicted 15 April 1965. After *Schowgurow v. State,* 240 Md. 121, 213 A. 2d 475 (11 October 1965), the charges were dismissed and he was indicted again on 6 November 1965. It is obvious there is no merit in this contention.

## VIII.

Dr. Michael J. Pescor is the Director of Correctional Psychiatry at Perkins. He is a graduate of the University of Wisconsin Medical School. Since 1940 he has been a diplomate of the American Board of Psychiatry and Neurology. He practiced his specialty in the U. S. Public Health Service for 30 years before retiring from the service in November 1962. He is a fellow of the American Psychiatric Association and a member of the Maryland Psychiatric Association. The trial judge declared him "to be qualified as an expert in the field of psychiatry."

He saw appellant for the first and only time at the staff meeting in September 1965. Before the interview he heard various reports read, such as the case reports, the social service report, the psychologist's report and the nursing services report. He observed and heard the appellant during the interview. He heard the opinions expressed by the other physicians present and he formed and expressed to the staff meeting an opinion of his own. Later he saw the autopsy reports but he found in them no reason to change his opinion.

Appellant contends it was prejudicial error to allow Dr. Pescor to express to the jury his opinion that appellant was sane. We do not agree. Dr. Pescor emerges from this record as an experienced and well qualified expert. He was cross-examined aggressively and at length and if, as a result thereof, counsel effected some etiolation of his testimony it was the weight of it that suffered, not its admissibility. *Andrews v. Andrews,* 242 Md. 143, 152, 218 A. 2d 194 (1966) ; *State v. Tull,* 240 Md. 49, 54, 212 A. 2d 729 (1965).

## IX.

At the close of the State's case appellant sought a judgment of acquittal claiming that since there was evidence overcoming

the presumption of sanity the State had failed to prove appellant sane beyond a reasonable doubt. We think the trial judge's denial of appellant's motion was correct.

The evidence relied upon by appellant, if it exists at all, must be found in the testimony of Dr. Rudiger Breitnecker, the medical examiner. Appellant tried very hard to get Dr. Breitnecker to say that the evidence compelled a diagnosis of necrophilia, which he defined as "an abnormal desire * * * to cohabit with a dead body." He said he was not a psychiatrist and that he was "not qualified [or] willing to discuss what * * * [he thought] about it because * * * [he didn't] know enough about it," adding that he didn't "know anybody who is a necrophiliac." In any event appellant's sanity had to be measured by the *McNaghten*[5] rule and evidence of some mental disorder or instability, per se, is insufficient proof to overcome the presumption of sanity. *Jenkins v. State, supra.* Necrophilia,[6] as we understand the word, is a sexual deviation or aberration analogous to homosexuality, bestiality, sadism, masochism and the like. *McNaghten* sanity and necrophilia are not necessarily incompatible.

After appellant had produced the testimony of Dr. Hamilton and Mr. Oropallo he sought to have the trial judge suspend the trial and then and there instruct the jury that, the presumption of sanity having been overcome, the State now had

---

**5.** *Spencer v. State,* 69 Md. 28, 13 Atl. 809 (1888); Code, Art. 59, § 9 (1967 Cum. Supp.), effective 1 June 1967, substitutes for the *McNaghten* rule the Model Penal Code rule: "A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." In *League v. State,* 1 Md. App. 681, 232 A. 2d 828 (1967), the Court of Special Appeals held that the statute will not be given retroactive effect. See also, Rosen, *Contemporary Winds and Currents in Criminal Law, With Special Reference to Constitutional Criminal Procedure: A Defense and Appreciation,* 27 Md. L. Rev., 103, 125 (1967).

**6.** L. Hinsie and R. Campbell, *Psychiatric Dictionary* (3rd ed. 1960), p. 479; American Psychiatric Association, *Diagnostic and Statistical Manual, Mental Disorders* (1952), p. 38.

the burden of proving appellant sane beyond a reasonable doubt. The trial judge agreed (and it is not disputed) that the evidence, at that point, applying the *McNaghten* rule, was sufficient "to raise a question in the minds of reasonable men whether the * * * [appellant] is or is not insane." He refused to instruct the jury at that time but he did so at the conclusion of the evidence. We see no error here.

### X.

Code, Art. 59, § 11 (as amended by Chap. 771 of the Laws of Maryland, 1965), appellant complains, effects an unfair result as it applies to him. Had he been charged with a less serious crime, he points out, Dr. Hamilton's findings would have been conclusive of his insanity. But because he is charged with a crime punishable by death his sanity vel non must be decided by a jury, or a court sitting without a jury, on evidence presented at the trial. The short answer to his complaint is that it should be addressed, not to this Court, but to the Legislature.

Finally appellant contends the rejection of his motions for directed verdicts of not guilty by reason of insanity, offered at the close of the entire case, amounts to reversible error. There is no need to review the conflicting evidence on the question of sanity or insanity. We think what Chief Judge Prescott said, for the Court in *Ramsey v. State, supra,* could, with equal application, be repeated here:

> "This question gives us little difficulty. Appellant claims that there was insufficient evidence for the jury to have found him to be sane at the time of the commission of the crime. The case was tried by a jury. When a case is tried by a jury, the Court of Appeals does not weigh the evidence presented to the jury, but only determines its sufficiency to take a particular issue, or the entire case, to the jury. Cf. *Briley v. State,* 212 Md. 445, and *Tull v. State,* 230 Md. 596, and cases cited therein." *Id.* at 566-67.

### XI.

We shall repeat another comment by Judge Hammond which also seems appropriate. In *Jenkins, supra,* he concluded the

Court's opinion by saying (edited only to apply to the instant case) :

> "Appellant received the full protection the law affords an accused. He was assisted in his defense before a jury by a competent, conscientious and diligent lawyer. The record discloses the presiding judge was scrupulously careful in recognizing and enforcing his rights and the obligations of the State in the course of the prosecution. He had a fair trial, free from error prejudicial to him." *Id.* at 466.

*Judgments affirmed.*