## WESTFALL *v.* STATE

[No. 52, September Term, 1965.]

414

*Decided July 19, 1966.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, MARBURY, OPPENHEIMER and BARNES, JJ.

*Allen B. Spector* and *William H. Zinman* for the appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Edward Angeletti, Assistant State's Attorney,* on the brief, for the appellee.

MARBURY, J., delivered the opinion of the Court.

Larry D. Westfall, the appellant, was brought to trial in the Criminal Court of Baltimore under indictment No. 1680/64 wherein he was charged with unauthorized use of an automobile and in indictment No. 1681/64, in which he was charged with attempted burglary on April 24, 1964, of the warehouse of the Beth Jacob Congregation. The cases were consolidated, a jury trial was held, Judge Edwin Harlan presiding, and the jury returned a verdict of guilty under both indictments. At the conclusion of the jury trial on July 15, 1964, Judge Harlan, sitting without a jury, proceeded to try the defendant on two other charges arising out of indictment No. 1682/64 in which Westfall was charged with burglary of the Beth Jacob Congregation on February 14, 1964, and under indictment No. 1683/64 in which he was charged with a similar offense on January 25, 1964. Judge Harlan found the defendant guilty of both charges, and after a delay caused by the consideration of Westfall's unsuccessful motions for new trials, he was, on March 16, 1965, sentenced to serve not more than three years in the Maryland Correctional Institution for each of the four offenses, with the four sentences to run concurrently. From these judgments and sentences the appellant filed this consolidated appeal.

Unlike many criminal appellants, Westfall does not here raise the issue that the evidence adduced at the two trials below was insufficient to convict him, and for that reason we do not find it necessary to set forth in any detail the evidence produced by the State which linked Westfall with the four crimes above mentioned. For our purposes it will suffice to merely note that the combined testimony of the prosecuting witnesses, that of Charles Trenchard, who was a co-indictee in all four of the above numbered indictments, along with the testimony of two Baltimore City police officers as to oral admissions allegedly made by Westfall to them while in custody, was, if believed, sufficient evidence from which the triers of fact could properly have found that the four crimes had been committed, and that defendant Westfall unlawfully participated in their perpetration.

Raised on this appeal are three questions: (1) Was the ap-

pellant's oral confession, made while in police custody, properly admitted into evidence against him; (2) did Judge Harlan commit reversible error by allowing the appellant to be cross-examined during the jury trial about his earlier confinement in the Maryland Training School for Boys; and (3) did the trial judge commit reversible error during the jury trial by permitting the State to ask Arnold Ely, one of the defendant's witnesses, on cross-examination whether he had been indicted for receiving stolen goods from the defendant and his co-indictee, Trenchard.

*I*

In defendant-appellant's first trial for attempted burglary and unauthorized use of an automobile, Detective Robert DePaola and Sergeant Joseph Ulsch, of the Baltimore City Police, testified, out of the presence of the jury, in regard to the voluntariness of the oral confession which appellant allegedly made to them. They testified that on Sunday morning, April 26, 1964, Westfall voluntarily turned himself in at the North Western Police Station after he had learned that the police were looking for him (a warrant had been issued for his arrest) in connection with the attempted burglary of the Beth Jacob Congregation three days earlier. Both officers testified that from the outset of the interrogation Westfall steadfastly refused to give them a written statement, and that he refused to talk about the crimes if they took notes. However, even after he had been advised that anything he "told them would be used for or against him in court" the defendant proceeded to give them an oral statement —which it later developed was thoroughly inculpatory.

According to the police officers the oral confession here involved was obtained as the result of questioning which took place over a two and one half hour period from 11:30 on Sunday morning to 2:00 that afternoon with time out for lunch and numerous interruptions. At the outset of the interrogation Westfall was confronted with a written statement which earlier had been given to the police by Charles Trenchard wherein he spelled out the participation by himself and Westfall in all four crimes. Trenchard's statement was used as an outline from which the officers questioned the defendant, and in that manner they were able to elicit from Westfall a complete state-

ment concerning all four crimes in a period of only about one hour of actual interrogation.

Out of the presence of the jury the eighteen year old defendant took the stand as to the voluntariness of the confession and related that before going down to the police station to turn himself in, he had talked to an attorney over the telephone. His attorney's advice to him was "not to sign a statement or say anything," and according to the defendant-appellant he informed the two officers at the outset of the interrogation that upon advice of counsel he was not going to say or sign anything. He testified that one of the policemen informed him, using obscenities, that he didn't care "if he had forty-nine lawyers" and commenced interrogating him forthwith. The witness further testified that at one point of the police interrogation which lasted "all day" Detective DePaola had said that he should beat his (Westfall's) head against the wall for "hanging around" with Arnold Ely, the latter being a friend whose company Westfall had chosen while the police were looking for him. Westfall also stated that Detective DePaola had called him obscene names at various junctures of the interrogation. On cross-examination, however, he admitted that anything he had told the police officers was said of his own free will, that no force was used against him, nor was he offered any immunity or rewards for his statement. Detective DePaola had earlier specifically denied calling the defendant obscene names or having made the statement about beating his head against the wall, and asserted, as had Sergeant Ulsch, that no immunities were offered, that no threats were made, or force used in getting the oral statement, and that it was freely and voluntarily given. After hearing the testimony of the police officers and the defendant, Judge Harlan allowed the oral confession to come into evidence.

When the jury had returned, both officers, for the benefit of the jury, repeated in substance their earlier testimony as to the voluntariness of the oral statement. One slight inconsistency did develop when Sergeant Ulsch told the jury that the defendant had told them at the beginning of the interrogation that upon advice of an attorney he would give them no written statement, whereas he had earlier testified that at the outset of the interrogation defendant did not tell them he had con-

sulted an attorney. Detective DePaola then related to the jury what the defendant had admitted during the in-custody interrogation concerning his participation in the two crimes involved in that trial.

Westfall also told the jury substantially the same thing he told the trial judge about the circumstances under which he was questioned, except that he said that he had interpreted his lawyer's advice as meaning not to give the police any *written* statement. He further revealed that at one point of the interrogation, the police had offered to bring his father down to the police station, if he so desired.

As to the substance of the oral confession, Westfall told the jury, in effect, that he had followed his lawyer's advice, and when confronted with questions regarding the two crimes he told the officers that "he didn't know what they were talking about," and that throughout the hours of questioning no incriminatory words came from his lips. In regard to the merits of the charges against him, the defendant admitted on the stand that he had ridden to the Beth Jacob synagogue on the night of April 24 in the car of which he was the accused unauthorized user and that he was at the scene of the attempted burglary, but, he explained, he had been sent there as a "decoy" by the Baltimore City police so that they might apprehend Charles Trenchard.

In the non-jury trial on indictments Nos. 1682/64 and 1683/64 the police as well as Westfall reiterated, in substance, the testimony given earlier to the jury in regard to the voluntariness of the oral confession, and Judge Harlan allowed Detective DePaola to testify to the inculpatory facts regarding the crimes charged in the above indictments which were gleaned from Westfall during the interrogation. After testifying as to the voluntariness of the oral statement, Westfall did not later resume the stand.

On this appeal the appellant contends that it was reversible error to permit the oral confession to be used against him because the testimony of the State's own witnesses allegedly revealed that appellant: (1) was not effectively advised that his oral statement might be used against him in court, and (2) did not have an attorney present when he was questioned. As

pointed out by the appellant, there is no testimony from which we can find that Detective DePaola specifically distinguished between an oral and a written confession after he had advised him that "anything he told me would be used for or against him in court," and for the purposes of this appeal it will be assumed that Westfall's aversion to having notes taken during interrogation can be explained on no other premise than that he was laboring under the misconception that an oral confession could not later be used against him, but neither of these facts would compel the trial judge to disallow these statements from coming into evidence. This is true because on the dates on which these two trials were commenced, under the existing Maryland law, even if the defendant had been given absolutely no warning that the statements could later be used against him, it would not make the oral confession inadmissible. *Jenkins v. State,* 238 Md. 451, 459, 209 A. 2d 616. See also *Dyson v. State,* 238 Md. 398, 405, 209 A. 2d 609, and cases therein cited. Likewise, on those dates, that fact, plus absence of counsel at the time of interrogation, would not make the confessions which resulted therefrom inadmissible. See *Jenkins v. State,* and *Dyson v. State,* both *supra.* Recently, June 13, 1966, in *Miranda v. Arizona,* 384 U. S. 436, in an opinion discussing issues similar to the ones here raised, the United States Supreme Court held that a confession which is the result of in-custody police interrogation is not admissible into evidence against a criminal defendant unless the state can show, *inter alia,* that: (1) the declarant was, prior to interrogation, given a clear and unequivocal warning that he has a right to remain silent and that anything he says may be used against him in court (see pages 467-469 of *Miranda, supra*), and (2) he was advised that he had the right to have an attorney present while being interrogated (see page 471, *Miranda, supra*). In *Johnson v. New Jersey,* 384 U. S. 719 (June 20, 1966), the Supreme Court held, however, that these newly enunciated constitutional principles need not be retroactively applied to cases, like the instant one, which were commenced before the *Miranda* decision was rendered, and because of the severe hardship which would be imposed on the administration of criminal justice in this State by a broader application, we will not apply them to such cases.

As recognized in *Davis v. State of North Carolina,* 384

U. S. 737, however, (decided on the same day as was *Johnson, supra*) even in cases commenced before *Miranda,* failure to advise an accused of his right to have counsel present during interrogation and failure to advise him of his right to remain silent are "significant factors" in determining the substantive voluntariness of a confession, although a conviction based on such confessions will not be reversed on those grounds alone. See page 740 of *Davis, supra. Davis,* where the Supreme Court reversed the conviction of the petitioner, is clearly distinguishable from the present case because the Court found several other factors present besides the failure to comply with the newly announced *Miranda* requirements, which made the confession involuntary. Among those other factors were: the fact that Davis was an impoverished Negro with only a third or fourth grade education; contained on Davis' arrest sheet was the directive that no one was to see the accused and he was not to be permitted to use the telephone; no one other than the police saw the accused during the sixteen days of detention and interrogation that preceded his confession; and his diet was extremely limited prior to his confession and could well have adversely affected his physical strength and his ability to resist confession. The record before us shows no hint of any "other factors" which would make the confession here involuntary; the record shows uncontradictedly that the interrogation lasted at most "all day," that the accused had the advice of counsel shortly before he confessed; and that police in no respect held the accused incommunicado.

Appellant attempts to produce these "other factors" and claims his confession to be substantively involuntary because the police officers' testimony was assertedly not worthy of belief. Appellant ignores his own testimony which was to the effect that anything he said was uttered freely, without coercion or inducement, and in effect he asked the court to take judicial notice of the asserted fact that the police could not possibly have gotten as much inculpatory information as they said they did in such a short period of time without using some untoward pressures. From the police officers' testimony, the triers of the facts, in both cases, could properly have found that the police used Trenchard's written statement as an outline from

which to question Westfall and that the latter voluntarily told them basically the same things that Trenchard had earlier related to them. If that were believed, then there is certainly nothing inherently improbable about an uncoerced declarant verbally covering that much ground over the course of about one hour of questioning. Appellant also mentions the inconsistency in Sergeant Ulsch's testimony about whether he knew or did not know that the appellant had consulted an attorney before the outset of interrogation. At the time this police officer gave that testimony, whether he knew or did not know about such consultation would not affect the officer's right to interrogate and, in any event, one inconsistency would not necessarily make all the subsequent testimony of that officer, and that of his brother officer, unworthy of belief.

. Appellant also asserts that the principles enunciated in *Escobedo v. Illinois,* 378 U. S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, make this oral confession inadmissible into evidence against him. The precise holding which the Supreme Court recognized must be applied to cases such as appellant's (since it was commenced after *Escobedo* was decided) was that a confession could not be used against an accused at a criminal trial,

> " '[where] the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, *the suspect has requested and been denied an opportunity to consult with his lawyer,* and the police have not effectively warned him of his absolute constitutional right to remain silent * * *' 378 U. S., at 490-491." (Emphasis added.) (p. 734 of *Johnson, supra*)

Since there is no evidence in the instant case that the appellant was ever denied permission to consult his counsel or that he ever requested to see him, *Escobedo* is not here apposite.

## II

The next question raised on this appeal is whether reversible error was committed by the trial judge, during the jury trial,

when he failed to sustain the objections raised by appellant's counsel regarding questioning about Westfall's past juvenile record. The record discloses that the following colloquy took place at the trial:

> "Cross Examination by Mr. Angeletti [Assistant State's Attorney]:
>
> Q. Mr. Westfall, have you ever been in any trouble at all?
>
> MR. SPECTOR [Defendant's privately retained attorney]: Objection.
>
> MR. ANGELETTI: Q. Have you ever been in any trouble, just yes or no?
>
> A. Yes, sir.
>
> Q. Have you ever been in the Maryland Training School?
>
> A. Yes, sir.
>
> MR. SPECTOR: Objection.
>
> THE COURT: Well, I think that is sufficient.
>
> MR. SPECTOR: May we approach the bench?
> (Bench Conference)"

The above questioning took place just after the defendant had told the jury on direct examination that he had no criminal record and that he had appeared at the scene of the crimes purely as a police "decoy." We think that appellant's contention has merit since the question as to his ever being in the Maryland Training School was manifestly improper before the jury.

The State admits that it is impermissible to attack the credibility of a witness by directly asking him about his past record of juvenile offenses. See Code (1957), Article 26, Section 61 (2); *Braun v. State,* 230 Md. 82, 185 A. 2d 905 (1962); and 98 C.J.S., *Witnesses,* Section 507, page 409 and cases cited therein. By asking if he had ever been confined in the Maryland Training School and obtaining an admission of such confinement, the jury was indirectly permitted to learn of his past juvenile record, inasmuch as that institution is for confinement for dependent, neglected, or delinquent youths adjudicated to be such by the court, pursuant to Code (1957), Article 26,

Section 52. Such a question, following as it did after the one about "ever being in trouble before" was extremely likely to make a jury of laymen think that the defendant was contradicting his earlier statement that he had no previous criminal record. Moreover, the response to this question was likely to have affected the jury's evaluation of the defendant's credibility when it weighed his testimony in regard to his "decoy" story.

Citing *Braun v. State, supra,* the State asserts that this questioning amounted to harmless error. *Braun,* where we held that the questioning as to juvenile offenses was harmless error, is inapposite here, because there the defendant had also been properly questioned about numerous adult offenses (two convictions of burglary, one of larceny and one of embezzlement) which would tend to impeach his credibility anyway, whereas in the instant case the defendant had no record which could have been properly so used. For the reasons stated, we think that the cross-examination by the State prejudiced the right of the defendant to have a fair and impartial jury trial, and thus the judgments and sentences rendered under indictments Nos. 1680/64 and 1681/64 must be reversed and the cases remanded for new trial.

In the second trial under indictments Nos. 1682/64 and 1683/64 there was no reference made to appellant's past juvenile record, and his credibility was never put at issue. In the non-jury trial, it will be recalled, Westfall took the stand on the issue of the voluntariness of his oral statement only, and in that respect his testimony was substantially the same as that of his interrogators, *i.e.,* that anything he told the police was uttered voluntarily without any force, threat, or inducement. Moreover, even if appellant's credibility had been at issue, it certainly can not be presumed that a trial judge allowed matters not in evidence before him to interfere with his determination of the case on trial. Thus, the second trial was in no way tainted by the mistake made in the first and, therefore, the convictions rendered under indictments Nos. 1682/64 and 1683/64 must be allowed to stand.

In view of our earlier holding that the judgments entered upon the defendant's convictions in the jury trial must be re-

versed, we do not reach appellant's third contention, which involves other alleged errors committed in that trial.

*Judgments as to indictments Nos. 1680/64 and 1681/64 reversed and cases remanded for new trial; Judgments in Nos. 1682/64 and 1683/64 affirmed. Costs to be paid one-half by the State and the remaining one-half by the appellant.*