## RAYMOND JAMES DUCKETT, JOHN W. SMITH AND JAMES ISIAH LEE, JR. *v.* STATE OF MARYLAND

[Nos. 31 and 182, September Term, 1967.]

*Decided April 5, 1968.*

The cause was argued before MURPHY, C. J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Henry F. Leonnig, Glenn B. Harten,* and *Kenneth E. Pruden* for appellants Duckett and Smith; *Joseph E. O'Brien, Jr.,* for appellant Lee.

*Alfred J. O'Ferrall, III, Assistant Attorney General,* with

whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Benjamin Wolman, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

At a joint trial concluded on November 23, 1966, the three appellants were found guilty by a jury in the Circuit Court for Prince George's County of the kidnapping and rape of Betty Jean Robinson. Appellants Duckett and Lee were each sentenced to terms of twenty years in the Maryland Penitentiary for rape and three years concurrently for kidnapping. Appellant Smith was sentenced to eighteen years in the Maryland Penitentiary for rape and three years concurrently for kidnapping. On these appeals from those judgments, the appellants contend, both individually and collectively (a) that their arrests were illegal and all evidence thereafter secured from them by the police, both tangible and intangible, should not have been received in evidence, and (b) that statements made by them to the police following their arrests were inadmissible as having been secured in violation of the principles enunciated in *Miranda v. Arizona,* 384 U. S. 436, and (c) that their post-arrest identification by the victim was conducted under conditions violative of their Fourteenth Amendment rights, and evidence of their silence while in police custody in the face of the victim's accusations was also improperly admitted in evidence against them, and (d) that the lower court erred in failing to grant their respective motions for a mistrial. The appellant Smith raises the further contention that the evidence was insufficient to convict him as a principal under the kidnapping charge.

There was evidence adduced at the trial tending to establish that on the evening of Saturday, September 24, 1966, Mr. and Mrs. Evon Robinson were returning to their home in Washington, D. C. from Waldorf, Maryland where they had been visiting Mrs. Robinson's aunt, Inez McConnell. As they were unable to get a bus to the District, the Robinsons stopped at the State Police Barracks at Waldorf to inquire about taxi service. Since this mode of transportation proved too expensive, Mr. and Mrs. Robinson returned on foot to Route 301 where they hoped to flag down a· bus to the District line. At this time a

car containing six male youths, including the three appellants, stopped, and the occupants agreed to transport the Robinsons to the District line. The Robinsons entered the car which proceeded up Route 301 for a time before turning off on a side road. The youths explained to Mr. and Mrs. Robinson that they were going to stop at a house party and that they would later transport them to their destination. The Robinsons accompanied the six youths to the party at the home of Mrs. Harriett Swann where they remained for approximately an hour. Upon their departure they got into the same car with the same six youths and an additional unidentified young man. They proceeded a short distance when the driver stopped and announced that the car had a flat tire. All of the occupants, except the driver and Mrs. Robinson, got out of the car to fix the tire. The driver then drove off with Mrs. Robinson, immediately after which the appellant Lee fired several shots at Mr. Robinson. The six youths, including the three appellants, then ran after and re-entered the car. Restraining Mrs. Robinson, they drove off, stopping again at a field where they threw her out on the grass, beat her about the face, and held her down while each had sexual relations with her. The youths then departed, leaving Mrs. Robinson in the field. She subsequently made her way to a church where she spent the remainder of the night on the steps, being discovered in the morning by a caretaker, who took her to her aunt's home in Waldorf.

After the seven youths had driven off with his wife, Mr. Robinson located a house and called the Maryland State Police at the Marlboro outpost. Trooper David Miller, responding to the call, met Mr. Robinson at approximately 3:30 a.m. on the morning of September 25. Mr. Robinson related the story of his wife's abduction to Trooper Miller, informing him that the car in which she was taken was an old model Chevrolet with damage to the left rear fender. An hour-long search of the area revealed nothing, and they returned to Marlboro. The search was resumed at 6:00 a.m., during the course of which Mr. Robinson identified the Swann residence. Trooper Miller spoke with Mrs. Swann who told him that she had had a party the night before, that she recognized Mr. Robinson as having been there, and that she thought that one of the Duckett boys, as well as a boy

named Isiah, were involved in the crime. Trooper Miller then returned to Marlboro with Mr. Robinson and reported the results of his investigation to Corporal Don Edward Ansell. After Mr. Robinson told Corporal Ansell about the crime, and provided him with descriptions of the abductors, he was shown several photographs and picked out those of appellants Duckett and Lee as two of the participants in the crime. Corporal Ansell then obtained warrants for the arrests of appellants Duckett and Lee. Later that morning, at approximately 11:00 a.m., Mrs. Robinson was brought to police headquarters where she related the story of her abduction and rape to Trooper Ansell, giving him descriptions of her assailants at that time.

At approximately 11:30 a.m. on September 25, Corporal Ansell, together with Trooper First Class Fisher, located the appellant Duckett driving a 1955 Chevrolet with damage to the left rear fender. The policemen stopped the car and told Duckett that he was under arrest. Duckett got out of his car and stood between it and the police cruiser. In Corporal Ansell's presence, Trooper Fisher advised Duckett:

> "that anything he said could be used against him, he advised him that he had a right to remain quiet, that he had a right to contact his own attorney, if he couldn't afford an attorney the court would appoint him an attorney."

The officer asked Duckett "if he wanted a lawyer," to which Duckett replied "no." After the officers had searched Duckett's car, and discovered a blue skirt and a revolver, they asked Duckett "where the woman was from last night," to which question he replied that he "didn't know anything about a woman." Ansell then asked him to account for his whereabouts during the early morning hours of September 25. Duckett stated that he had been with his wife, but then changed his story and told the officers that he was with his girlfriend and had spent the entire night with her. In response to further questioning, he stated that he had been shooting dice at about approximately 10:30 or 11:00 p.m. on the night of September 24 and that the car he was driving was owned by a friend, Richard Savoy.

Appellant Lee was arrested at 12:15 p.m. on the same day by Corporal Ansell and Trooper Fisher as he was emerging from a tavern. As Lee was standing outside of the police car, Corporal Ansell advised him that:

> "anything he said could be used against him, he had a right to remain silent, he had a right to contact an attorney, he had a right to a court-appointed attorney if he could not afford his own attorney."

When asked "if he desired an attorney" appellant Lee replied "no." After Lee had been placed in the police cruiser, Ansell asked him "about the kidnapping of Betty Jean Robinson." Lee responded, stating that "he didn't know what we were talking about, that he was trying to keep out of trouble and we kept picking him up and he didn't do anything wrong, said he never saw a man or woman the night before."

On the afternoon of September 25, after the arrests of appellants Duckett and Lee, Corporal Ansell visited the residence of Mrs. Swann who told him that two of the boys who were with Duckett and Lee were from Louisiana and were working on the Downing farm in Naylor. Corporal Ansell proceeded to the farm and was told that several boys from Louisiana did work there, including appellant Smith. Smith was not at the farm then, but Corporal Ansell learned from a farm employee that Smith and another boy had been out the night before and that when they came in "Smith had a whole bunch of stuff over the front part of his pants by the fly and they were talking about how they had taken some woman away from her old man and taken her down and raped her." Smith's pants were then shown to Corporal Ansell, who thereupon obtained a warrant for Smith's arrest. Smith was arrested later that night at approximately 10:00 p.m., while at a park and in the company of four colored males, including Willie Griggs, another suspect. Prior to being placed in a police cruiser, appellant Smith and Griggs were advised by Corporal Ansell that:

> "I told them anything they said could be used against them, that they had a right to remain silent, that they had a right to contact an attorney of their own choos-

ing, that they had a right to a court-appointed attorney if they couldn't afford one of their own."

In response to Ansell's question as to whether they "wanted an attorney," appellant Smith replied "no." Appellant Smith and Griggs were then placed in a police car and taken to police headquarters where Smith, without any further warnings being given to him, was questioned about the crimes and acknowledged his familiarity with them, stating that he was willing to discuss the crimes with the police. In response to questioning by police, appellant Smith admitted that he had been in the car and had picked up "a couple on 301," that they went to a house party, after which they drove down the road, "fired a gun," and then drove to the place where the "woman was raped." Smith then identified photographs of Griggs and two others who had participated in the crime. He showed the police where one of the boys who had participated in the crime lived, and also directed police to a field off of Brooks Church Road, where he stated that the rape had occurred. With Smith's help, the officers searched the field and found a rent receipt, a black shoe and a piece of an undergarment, all of which belonged to Mrs. Robinson.

On the morning of Monday, September 26, the three appellants were taken to the Peoples Court at Marlboro for a preliminary hearing. The presiding magistrate informed each appellant of his right to counsel, either retained or appointed, his right to a hearing, and his right to waive a hearing, together with the consequences of such a waiver. Each of the appellants chose to waive the preliminary hearing. Following this procedure, the appellants were placed in several line-ups, but evidence that they were identified by Mr. and Mrs. Robinson was stricken from the record.

Subsequently, on September 29 at about 5:00 p.m., in the attorney's room at the county jail in Marlboro, each appellant was individually confronted with and identified by Mr. and Mrs. Robinson as having been participants in the kidnapping and rape. When thus confronted by the Robinsons, appellant Duckett stated, "I have seen you all before." When appellant Lee was similarly identified, he stated, "You take a good look

at me, you have never seen me since we got out of the car in the road."

Mr. and Mrs. Robinson identified the appellants at the trial. Appellant Smith took the stand in his own behalf, admitted having relations with Mrs. Robinson, but stated that she had voluntarily submitted for a $5.00 fee. Appellant Lee also testified, stating that he had left the scene at the time of the flat tire incident, and had not had relations with the prosecutrix. Motions for judgment of acquittal on behalf of each appellant offered at the end of the entire case, were denied by the court.

## The Legality of the Arrests

Appellants contend that their arrests were illegal because Corporal Ansell did not make oath or affirmation before the magistate when he obtained the arrest warrants. While the State concedes that the warrants were invalid for failure of Corporal Ansell to make the requisite oath, it contends that the arrests were nevertheless lawful as having been based on probable cause to believe that a felony had been committed and that appellants had committed it. Notwithstanding the invalidity of the arrest warrants, and the fact that the officers, in making the arrests, purported to do so by authority of the warrants, we think the arrests were lawful.

Prior to their arrests, appellants Duckett and Lee had been identified from their photographs by Mr. Robinson as two of the men who had abducted his wife. He also identified appellant Lee as the person who had fired the shots at him, and described the car in which his wife was abducted as an old model Chevrolet with damage to the left rear fender. The officers knew from Mrs. Robinson that a rape had occurred and had a description of the persons involved.[1] Mrs. Swann had verified the fact that the Robinsons had been to her house on the night of the crimes. And when the officers apprehended appellant Duckett, he was driving a car of the same description as that in which,

---

1. While it is not entirely clear from the record, it appears that Mrs. Robinson and Mrs. Swann identified photographs of the appellants Duckett and Lee *after* they had been arrested, rather than before, so that these identifications may not be considered in determining the existence of probable cause to make the arrests.

according to Mr. Robinson's information to the police, his wife had been abducted.

Prior to appellant Smith's arrest, the officers had been advised by Mrs. Swann that two of the boys at her party on the night of the crime, worked at a nearby farm. The police thereafter went to the farm and there learned that Smith and a companion had been out the night of the crime, that Smith had returned with semen on his trousers, and had bragged about having raped a woman.

It is, of course, elementary that a police officer may make an arrest without a warrant where he has reasonable grounds or probable cause to believe at the time of the arrest that a felony has been committed and that the person arrested has committed the offense. *Edwardsen v. State,* 243 Md. 131; *Lewis v. State,* 2 Md. App. 678; *Gaudio v. State,* 1 Md. App. 455. In *Berigan v. State,* 2 Md. App. 666, we intimated that even though an arrest warrant was void, nevertheless if there was probable cause to arrest for a felony, the arrest would have been lawful. Compare *Gattus v. State,* 204 Md. 589, a case involving a void search warrant, where the court indicated that if, in executing the warrant, a misdemeanor was being committed in the presence of a police officer, an arrest and subsequent search incident thereto could have then been made, notwithstanding the fact that the search warrant was itself invalid. To the same effect, see *People v. Grubb,* 58 Cal. Rptr. 670 (Ct. App., 5th Dist.).

We conclude, therefore, that the arrests were lawful on the ground that the arresting officers had probable cause to believe that a felony or felonies had been committed and that appellants were the guilty participants. We further hold that the contemporaneous search of appellant Duckett's car at the scene of his arrest was likewise lawful; and that the revolver and skirt taken from his vehicle at that time were properly received in evidence.

## The Admissibility of Appellants' Oral Statements

As heretofore indicated, the record discloses that each appellant was told, at the time of his arrest, of his right to remain silent, that anything he said could be used against him in court, that he had a right "to contact" an attorney, and that he had

a right to a court-appointed attorney if he could not afford his own attorney. The record further discloses that after the *Miranda* warnings were given to appellants, each of them was asked whether he wanted or desired an attorney and each responded in the negative, and proceeded to answer police questions concerning his knowledge of the crime.[2]

Appellants Duckett and Lee contend that their oral exculpatory statements made at the time of their arrests were inadmissible in evidence on the ground that the arresting officers did not, in advising them of their rights under *Miranda,* tell them that they had a right to the presence of counsel prior to questioning them. Appellant Smith advances the same contention with reference to the oral inculpatory statement which he made at the police station immediately following his arrest. The State contends on the other hand that all required *Miranda* warnings were given prior to interrogation, but that in any event the statements were admissible in evidence since they were voluntarily given, and did not result from "custodial interrogation" within the meaning of the *Miranda* decision. In *Miranda,* the court, in the introductory phases of its opinion, held at page 444 that prior to any custodial interrogation by police, the person to be interrogated must be advised, *inter alia,* that he "has a right to the presence of an attorney, either retained or appointed." In the course of its opinion, the court made it entirely plain at page 469 that the "right to the presence of an attorney" meant "the right to have counsel present at the interrogation." More specifically, the court held at page 471 "that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation," and that "this warning is an absolute prerequisite to interrogation." The court emphasized the importance of this warning when it held at page 469-470 that "the right to have counsel present at the interrogation is indispensible to the protection of the Fifth Amendment privilege" and that "the need for counsel to protect the Fifth Amend-

---

**2.** The record does not indicate that appellants were asked whether they understood the import of the *Miranda* warnings and were nevertheless willing to respond to police questioning. See *Johnny Mack Brown v. State,* 3 Md. App. 313.

ment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." Indeed, one of the reasons given by the court for reversing Miranda's conviction was because he "was not in any way apprised of his right to consult with an attorney and to have one present during the interrogation." 384 U. S. at page 492.

It is clear to us, therefore, that it is of the essence of the *Miranda* rationale that to fully protect the Fifth Amendment privilege a person about to undergo custodial interrogation must be informed, *in substance,* "that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." The Court of Appeals of Maryland so concluded in *Campbell v. State,* 244 Md. 363, and in *Westfall v. State,* 243 Md. 413. In *Thomas v. State,* 3 Md. App. 101, we held that failure of police to advise a prisoner subjected to in-custody interrogation of his right "to the presence of an attorney" during the interrogation was such an omission of a crucial *Miranda* warning as to render the accused's confession in that case constitutionally impermissible. In *Hunt v. State,* 2 Md. App. 443, we held that *Miranda* required, *inter alia,* that a prisoner be told, prior to undergoing custodial interrogation, that "he had a right to have counsel present during the actual questioning and to consult with him."

We hold that merely advising a person who has been arrested and who is about to be questioned with reference to the crime that he has a right "to contact" a lawyer does not comport with *Miranda* requirements concerning the warning of his right to the presence of counsel. Nor does the advice that the prisoner has a right "to contact" a lawyer, coupled with an inquiry as to whether he wants an attorney, constitute, in our judgment, the substance or equivalent of advice to the person that he "has the right to consult with a lawyer and to have the lawyer with him during interrogation." And the fact that appellants expressly declined the police offer of an attorney does not, in the circumstances of this case, amount to an intentional relinquishment or abandonment of a known right or privilege—this being the test of waiver enunciated in *Miranda*—since the scope of their right to the presence of counsel was never initially ex-

plained to them in the terms required by *Miranda*. See *Johnny Mack Brown v. State, supra*. While we think the warning principles announced in the *Miranda* case must be applied reasonably, and with common sense, and do not constitute an arid, ritualistic formula to be administered inflexibly (see *Commonwealth v. Wilbur*, 231 N. E. 2d 919, 923 (Mass.)), we conclude that the *substance* of the required warning of appellants' right to counsel was not given to them prior to interrogation.

We further hold that at the time each appellant responded to questioning by police, he was under arrest and "in custody" within the meaning of the *Miranda* decision. In *Miranda*, it was held at page 444 that "custodial interrogation" meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." In *Gaudio v. State, supra*, we had occasion to consider in detail the exact reach of the term "custodial interrogation," as used in *Miranda*. We there noted that *Miranda* was primarily concerned with the evils of incommunicado interrogation of individuals in a police dominated atmosphere, such as in the interrogation room of a police station. We concluded in *Gaudio* that *Miranda* does not forbid all inquiry of an accused without warning under all circumstances. In *Carwell v. State*, 2 Md. App. 45, we held that *Miranda* did not apply to a case where after arrest, but before any questioning was initiated, the defendant "blurted out" a statement. In *Crosby v. State*, 2 Md. App. 578, we held that *Miranda* did not require that an arrestee, at the time of his arrest, be immediately informed with respect to the procedural safeguards established by *Miranda*. In *Morgan v. State*, 2 Md. App. 440, we held that an individual suspected of a crime may be questioned while on the street, and not in an arrest status, without the necessity of first advising him of the constitutional protections afforded under the *Miranda* decision. To like effect, see *Jones v. State*, 2 Md. App. 429. In *Duffy v. State*, 243 Md. 425, it was held that an accused suspect need not be advised that he has the right to the presence of counsel before the first question can be propounded to him, since *Miranda* was not applicable to a confession gleaned from a suspect who was merely accosted by the police.

The New York Court of Appeals, in *People v. Rodney P.,* 233 N. E. 2d 255, 286 N. Y. S. 2d 225, in considering "the problem of defining precisely the circumstances and conditions in which the police are required to advise an individual of his constitutional rights [under *Miranda*] before proceeding with interrogation," reached this conclusion (286 N. Y. S. 2d, at page 234) :

> "* * * since, as a practical matter, a person's freedom is restrained or it is not, and he either feels free or does not, we believe that, in prefacing the word 're- straint' with the adjective 'significant', the Supreme Court intended that the warnings be given when the questioning takes place under circumstances which are likely to affect substantially the individual's 'will to re- sist and compel him to speak where he would not other- wise do so freely.' "

Appellants Duckett and Lee were questioned immediately after their arrest by the police as they stood near the police car, and part of the interrogation of appellant Lee appears to have been conducted while he was sitting in the police car. Appel- lant Smith's post-arrest interrogation was conducted at the police station. That each appellant's statement resulted from a custodial interrogation within the meaning of *Miranda* is too clear to require further discussion.

We conclude further that the error in admitting appellants' statements was not harmless within the meaning of *Chapman v. California,* 386 U. S. 18. In that case, the Supreme Court held that there may be some federal constitutional errors which, in the setting of a particular case, are so unimportant and in- significant that they may, consistent with the federal constitu- tion, be deemed harmless ; but that before a federal constitutional error could be held harmless in a State criminal trial, the ap- pellate court reviewing the conviction "must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U. S., at page 24.

Appellant Smith's statement was inculpatory and its admis- sion against him contrasted sharply with his trial testimony that Mrs. Robinson consented to the intercourse. Appellant Lee's

exculpatory statement denying knowledge of the victim's existence contrasted with his testimony at the trial that he had been in the car with the other participants in the crime, but had not had relations with the prosecutrix. Appellant Duckett's statement, although exculpatory, was self-contradictory, in that he first told police that he had been with his wife at the time of the crime, and changed his story, telling the officers that he had been with his girlfriend at that crucial time. Duckett's account of his whereabouts on the night of the crime was, therefore, conflicting and conveyed the impression that he was not truthful, thus tending indirectly to lend credence to the victim's identification of him as having been one of the participants in the crime. Under these circumstances, we cannot find that the admission of any of the statements was harmless beyond a reasonable doubt.

As a new trial must be granted for error in admitting appellants' statements into evidence, the question of whether the court erred in failing to grant appellant's motions for a mistrial, and the question of whether the evidence showed that appellant Smith was a principal in the kidnapping case, need not be answered. We deem it essential, however, to briefly express our views with respect to appellant Smith's argument that as his inculpatory statement was the source which led the police to the open field where the victim was raped, the tangible evidence there found (the victim's shoe and rent receipt, and a piece of cloth) was inadmissible under the "fruit of the poisonous tree" doctrine. While it may be true that the officers found these items with Smith's assistance, we think their use in evidence at the retrial of the case would not be prohibited by the application of the doctrine upon which appellant Smith places reliance. Without deciding whether that doctrine is applicable in State criminal trials, we believe that the evidence would in any event have been discovered by the police without Smith's assistance since the victim herself could have undoubtedly identified the scene of the crime. Smith's oral statement to the police, however, whereby he told the officers where one of the other participants in the crime lived would, in our judgment, be inadmissible as against him, since it stemmed from custodial interrogation initiated by law enforcement officers without fully advising the accused of his rights under the *Miranda* decision.

Finally, on the state of the record before us, it does not appear, as contended by appellants, that it was the purpose of the State to introduce evidence that the appellants maintained silence in the face of the victim's accusation of their guilt when confronted with the victim at the police station four days after their arrest. As the appellants were then in police custody, the admission of evidence calculated to show that they stood mute in the face of such accusation would, of course, have been clear error. See *Miranda v. Arizona, supra,* Footnote 37; *Cooper v. State,* 231 Md. 248; *Miller v. State,* 231 Md. 215; *Barnes v. State,* 1 Md. App. 123. What the record does indicate is that at appellant Lee's request, he was confronted with the victim and after she had accused him of being one of the participants in the crime, he stated, in effect, that he had seen the victim "in the car in the road." We believe the circumstances of Lee's confrontation with the victim are not such as would preclude the admission into evidence of his response to the victim's accusation. In so concluding, we are mindful of the fact that the confrontation occurred prior to June 12, 1967, the date upon which the Supreme Court handed down *United States v. Wade,* 388 U. S. 218, and *Gilbert v. California,* 388 U. S. 263, both of which indicate that a pretrial line-up, at which the accused is exhibited to identifying witnesses, is a critical stage of the criminal prosecution; and that conducting such a line-up in the absence of an effective waiver, and without notice to and in the absence of counsel for the accused, denies him his Sixth Amendment right to counsel. As *Wade* and *Gilbert* affect only those cases involving confrontations for identification purposes conducted in the absence of counsel after June 12, 1967, *Stovall v. Denno,* 388 U. S. 293, *Tender v. State,* 2 Md. App. 692, they have no direct application to Lee's case.

Unlike Lee, appellants Duckett and Smith did not request that they be confronted with the victim and the motivation and purpose of the police in arranging such a face to face confrontation is not altogether clear, particularly in view of the fact that the victim and her husband had identified appellant Duckett on three prior occasions and the appellant Smith on at least one prior occasion. While it would thus appear that the primary

purpose of the confrontation was not to have the victim make another identification, there is nothing in the record before us to indicate that the police, in arranging the confrontation, did so to create an inherently compulsive atmosphere, one calculated to elicit an admission of guilt from the appellants after the victim accused them of the crime. We do not decide, therefore, whether the procedure followed by the police in confronting appellants Duckett and Smith with the victim, under the circumstances, violated any of their constitutional rights.

*Judgments reversed. Case remanded for a new trial.*