# BERNARD LEE STOKES *v.* STATE OF MARYLAND

[No. 16, September Term, 1980.]

*Decided December 10, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Nancy Louise Cook, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Thomas P. Barbera, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

In this case we are called upon to apply that venerable principle of Maryland criminal law which prohibits the use of a defendant's significantly incriminating remark when that statement was extracted from him by promise of favor or threat of punishment.

The facts are not in dispute. At 2:30 a.m. on November 14, 1974, two narcotics officers of the Baltimore City Police Department, armed with a warrant, arrived to conduct a search for controlled dangerous substances at the house where petitioner Bernard Lee Stokes and his wife were living with several other persons. Upon entering the dwelling, the officers immediately went up to the Stokes' third floor bedroom where the two were sleeping. After identifying themselves, explaining their purpose, and advising the couple of their *Miranda* rights, the officers proceeded to search the room. Following an unsuccessful exploration lasting about five minutes, the officers terminated their quest, turned to Stokes and informed him "that if he would produce the narcotics, his wife would not be arrested." As a result of this assurance, the petitioner revealed to the officers that drugs were hidden in a "drop ceiling" on the left side of the room.[1] The officers then seized the contraband, heroin, and charged Stokes with its possession. At the ensuing trial in the Criminal Court of Baltimore (Grady, J.), Stokes objected to and moved to suppress both the heroin and his statement as to its location. The motion was denied, and Stokes was convicted of the possession charge.

On certiorari to this Court, after his conviction was affirmed in an unreported opinion by the Court of Special Appeals, petitioner contends, as he unsuccessfully contended both in the trial court and in the intermediate appellate court, that his inculpatory statement was involuntary since it was induced by a police promise not to arrest his wife. The State counters with an assertion that this promise, being one primarily designed "to benefit a relative" of the accused, does not impair the admissibility of the inculpatory statement extracted from Stokes nor the drugs which it revealed. Alternatively, the State urges that even

---

1. At trial, the Assistant State's Attorney, when reciting the agreed upon facts, additionally noted at one point that the petitioner "went to a location, a drop ceiling," and produced packets of drugs. Whether the drugs were uncovered as a result of petitioner's words or by his deeds is irrelevant, for it is settled that an act can constitute a statement for evidentiary purposes. See McCormick's Handbook on Evidence § 250 (2d. Ed. by E. Cleary 1972).

if the petitioner's statement is determined to have been involuntarily made, the seized heroin was properly admitted into evidence because the secreted drugs would inevitably have been discovered by the searching police without reliance on Stokes' guidance. Since we do not agree with either of these assertions, we will reverse the judgment entered in this cause.

Little more than one year has elapsed since this Court, in *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979), distilled and rearticulated the criminal law of Maryland concerning the voluntariness and admissibility of "significantly incriminating" statements resulting from "promises and other similar forms of inducement designed to elicit" inculpatory remarks. 286 Md. at 150-151, 406 A.2d at 418-419. Following an analysis of this State's relevant cases, we determined in *Hillard:*

> [u]nder Maryland criminal law, independent of any federal constitutional requirement, if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible.
>
> * * *
>
> [Thus,] it must be shown [by the State] . . . that the defendant's decision to make a statement . . . was not induced by any promise of favor or threat of punishment. [286 Md. at 153-154, 406 A.2d at 420.]

Recognizing the substantial barrier to its position caused by *Hillard,* the State, in its effort to parry defeat, urges that the teachings of two of our earlier cases, *Rogers v. State,* 89 Md. 424, 43 A. 922 (1899), and *Jones v. State,* 229 Md. 165, 182 A.2d 784 (1962), were neither under attack nor considered by our decision in *Hillard,* and, consequently, that opinion must be read in tandem with these two earlier precedents. Reasoning that since "*Rogers* and *Jones* conclusively

indicate that a promise to benefit a relative of a defendant is not sufficient, by itself, to support a finding that an admission in response thereto is involuntary under Maryland criminal law," the Attorney General extrapolates that those cases, rather than *Hillard,* are the controlling precedents here. Since, in our view, *Rogers* and *Jones* harbor no such undertone, and since we consider the *Hillard* doctrine to be controlling in the circumstances here, we assess the State's position to be without merit.

In *Rogers,* at the time the defendant and his sister were being questioned in the same room about a homicide, the brother confessed to having committed the murder following a police remark that "if your sister is innocent you are the only one who knows so, and it is your duty as a man to tell what you know about it." 89 Md. at 426-427, 43 A. at 923. The confession was admitted at trial, which ruling was upheld by this Court on appeal. In that case, however, it is clear that there was no threat, promise, or *quid pro quo* posited by the police remark, and therefore no factual predicate existed to support a finding of involuntariness. Thus, *Rogers* was not concerned with the issue petitioner presents here and constitutes no authority supportive of the contention made by the State.

In *Jones,* the trial court was faced with a claim, contradicted by the police, that the officers threatened prosecution of the defendant's pregnant common law wife in order to induce him to confess to a murder. 229 Md. at 171-172, 182 A.2d at 787. The circuit court resolved this evidentiary conflict against the defendant and this ruling was subsequently upheld on appeal. *Id.* at 172, 182 A.2d at 787. *See Jackson v. State,* 13 Md. App. 31, 36, 280 A.2d 914, 917 (1971). So, although the evidence presented at trial in *Jones* posed the issue we now ponder, the trial court there, by its resolution of this testimonial disagreement, destroyed any dispositive precedential impact the case otherwise may have had.

Turning now to the facts before us in this case, it is clear that the police not only promised petitioner they would not arrest his wife if he revealed the location of the heroin, but,

in addition, this promise bore fruit, for it is equally apparent that Stokes' statement directly resulted from that entreaty. The State's case is therefore reduced to dependence on an argument that "a promise to benefit a relative is not that type of advantage, help or special consideration to an accused which is contemplated by *Hillard.*" Responding to this contention with respect to the reach of *Hillard,* we make clear here, even if beclouded until now, that the mandate of that case encompasses the issue presented in this case and is dispositive of it. The rule in *Hillard* announces that a statement is rendered involuntary if it is induced by any official promise which redounds to the benefit or desire of the defendant. And this necessarily includes a promise not to harm (physically or emotionally) a near relative with whom the defendant naturally has a close bond of affection.[2] Indeed, in line with what we have just said with respect to a near relative, our predecessors in *Jones v. State, supra,* by their very willingness to examine the issue whether sufficient evidence existed to support the finding of the trial court that no threat to arrest the defendant's common law wife was in fact made, necessarily recognized that such an inducement, if proven, would have rendered the defendant's statement involuntary.

That principle of Maryland criminal law which excludes an inculpatory statement induced by "any promise of favor or threat of punishment," *Hillard, supra* at 154, 406 A.2d at 420, is, perhaps, more extensive than those of other jurisdictions. See, *e.g., Biscoe v. State,* 67 Md. 6, 7-10, 8 A. 571, 572-573 (1887) (defendant's confession given after an

---

2. While we now hold that a promise not to arrest a defendant's near relative benefits him sufficiently to render his statement induced by that promise involuntary, we have no occasion here to consider whether kinship is required, or the degree of closeness (kinship or otherwise) that a defendant must have to the affected third party, before the coercive effect of such inducements may be found to exist. *Compare* Jarrell v. State, 36 Md. App. 371, 378, 373 A.2d 975, 979-80 (1977) (indicating that consent to a warrantless search of his home given by the accused while in custody after being promised that his sick friend would be released was involuntary), *with* People v. Kendrick, 56 Cal. 2d 71, 14 Cal. Rptr. 13, 23, 363 P.2d 13 (1961) (confession not involuntary where officials allegedly promised release of defendant's associates who "were not related by blood or marriage but were only 'friends'.")

official urged "that it would be better for him to tell the truth" found to be involuntary). Nevertheless, we find substantial agreement that a promise not to arrest a near relative of the defendant, or a threat to do so, constitutes a form of inducement which will render a resulting statement involuntary. *See, e.g., Lynum v. Illinois,* 372 U.S. 528, 534, 83 S. Ct. 917, 9 L. Ed. 2d 922 (1963) (confession made after police threatened that state financial aid to defendant's children would be cut off and children taken from her); *People v. Manriquez,* 231 Cal. App. 2d 725, 42 Cal. Rptr. 157 (1965) (defendant's production of narcotics from his kitchen in response to police promise not to arrest his wife); *People v. Rand,* 202 Cal. App. 2d 668, 21 Cal. Rptr. 89 (1962) (defendant's admission that marijuana cigarettes were his prompted by police threat to arrest his wife and take his children "to juvenile"); *Jarriel v. State,* 317 So. 2d 141 (Fla. App. 1975) (threat to arrest wife unless defendant made statement); *Hall v. State,* 255 Ind. 606, 266 N.E.2d 16 (1971) (statement made after police noted that if defendant did not confess, his wife would be arrested and his children placed in the custody of others); *Hammer v. Commonwealth,* 207 Va. 135, 148 S.E.2d 878 (1966) (confession in response to police chief's promise to refrain from arresting defendant's wife and parents for possession of stolen property). Neither Maryland nor any other jurisdiction of which we are aware, however, goes so far as to say that a confession motivated solely by a defendant's sense of altruism, without the inducement of an official threat or promise, is involuntary. A finding that an inducement is impermissible, as we determine the one in this case to be, may only result where the challenged statement was produced by police words or deeds which communicated a threat or promise to the defendant. This is in accord with what our predecessors in *Jones v. State, supra,* thought desirable to make plain:

> Even if the defendant believed that his common law wife would not be held if he confessed, the confession was not thereby rendered involuntary or inadmissible merely because it was made to release another from suspicion of guilt: *there must also be*

> *sufficient evidence that the confession was actually induced by a threat or promise or other [improper] cause.* [229 Md. at 172, 182 A.2d at 788 (emphasis added).]

This view, stated in *Jones,* is also in line with those espoused by a number of our sister states that "where no express or implied promise or threat is made by the police, a suspect's belief that his cooperation will benefit a relative will not invalidate the ... [statement]." *People v. Steger,* 128 Cal. Rptr. 161, 168, 16 Cal. 3d 539, 546 P.2d 665, 672 (1976) (en banc); *see also, United States v. Mullens,* 536 F.2d 997, 1000 (2d Cir. 1976); *United States v. Brown,* 540 F.2d 1048, 1052-1053 (10th Cir. 1976); *United States v. McShane,* 462 F.2d 5, 7-8 (9th Cir. 1972); *Roberts v. State,* 545 S.W.2d 157, 161 (Tex. Crim. App. 1977); *Jackson v. State,* 13 Md. App. 31, 36, 280 A.2d 914, 916-917 (1971); Annot. 80 A.L.R.2d 1428 § 6[a].

Accordingly, petitioner's statement revealing the location of the illegal drugs for which he was convicted of possessing was involuntary since it was induced by an improper official promise not to arrest his wife, and is therefore inadmissible. *Hillard v. State, supra.*

The State, anticipating our conclusion that petitioner's statement was involuntary, argues alternatively that the drugs recovered from Stokes were obtained "by means sufficiently distinguishable [from the exploitation of the illegality] to be purged of the primary taint," *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441 (1963), and, consequently, this evidence, having been washed of its impurity, was properly admitted at the trial. In short, the State asks us to recognize and apply in Maryland what has been denominated elsewhere to be the inevitable discovery doctrine. This doctrine, which has gained increasing acceptance throughout the jurisprudential law of this nation. recognizes an exception to the traditional rule excluding from use at trial illegally gathered evidence or its poisoned "fruits." [3] This exception

---

3. Although the Supreme Court has not expressly recognized this exception to the exclusionary rule, *see* Fitzpatrick v. New York, 414 U.S. 1050,

permits the government to cleanse the fruit of poison by demonstrating that the evidence acquired through improper exploitation would have been discovered by law enforcement officials by utilization of legal means independent of the improper method employed. 3 W. LaFave, *Search and Seizure* § 11.4 at 620-628; La Count and Girese, *The "Inevitable Discovery" Rule, an Evolving Exception to the Constitutional Exclusionary Rule,* 40 Alb. L. Rev. 483 (1976); Maguire, *How to Unpoison the Fruit — the Fourth Amendment and the Exclusionary Rule,* 55 J. Crim. L.C. & P.S. 307, 313-321 (1964). To invoke the inevitable discovery exception to the exclusionary rule, the State is required, at a minimum, to affirmatively meet a two-part test. This test, as summarized by Professors LaCount and Girese, in their article *supra,* is:

> [T]he prosecution must establish, first, that certain proper and predictable investigatory procedures would have been utilized in the case at bar, and second, that those procedures would have inevitably resulted in the discovery of the evidence in question. [LaCount and Girese, *supra* at 491.]

For authorities supporting the text of this summary see *United States v. Brookins,* 614 F.2d 1037, 1048-1049 (5th Cir. 1980); *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 927-928 (3rd Cir. 1974), *cert. denied,* 420 U.S. 909 (1975); *People v. Chapman,* 261 Cal. App. 2d 149, 67 Cal. Rptr. 601, 613 (1968); *State v. Williams,* 285 N.W.2d 248, 260-262 (Iowa 1979); *People v. Payton,* 45 N.Y.2d 300, 313-314, 408 N.Y.S.2d 395, 401-402, 380 N.E.2d 224,

---

94 S. Ct. 554, 38 L. Ed. 2d 338 (1973) (White & Douglas, J.J., dissenting from denial of certiorari), the Court hinted at acceptance of the doctrine in a footnote to Brewer v. Williams, 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977). In *Brewer,* where defendant's statements leading the police to a murder victim's body were suppressed, the Court, in note 10, declared that, on retrial, "evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams." *See also* United States v. Crews, 445 U.S. 463, 100 S. Ct. 1244, 1249, 63 L. Ed. 2d 537, 545 (1980), where "inevitable discovery" was characterized as one of three "commonly advanced exceptions to the exclusionary rule."

230-231 (1978); *Santiago v. State,* 444 S.W.2d 758, 761 (Tex. Crim. App. 1969). Jurisdictions which recognize the doctrine caution that courts may not, under the guise of inevitable discovery, admit tainted evidence after launching a speculative inquiry into what might or could have occurred. *See, e.g., United States v. Brookins, supra; United States v. Paroutian,* 299 F.2d 486, 489 (2nd Cir. 1962); *People v. Schader,* 71 Cal. 2d 761, 457 P.2d 841, 852, 80 Cal. Rptr. 1, 12 (1969); *State v. Williams, supra; Santiago v. State, supra.* As one commentator has observed:

> The significance of the word "would" cannot be overemphasized. It is not enough to show that the evidence "might" or "could" have been otherwise obtained. Once the illegal act is shown to have been in fact the sole effective cause of the discovery of certain evidence, such evidence is inadmissible unless the prosecution severs the causal connection by an affirmative showing that it *would* have acquired the evidence in any event. In order to avoid the exclusionary rule, the government must establish that it *has not* benefitted by the illegal acts of its agents; a showing that it *might not* have so benefitted is insufficient. [Maguire, *supra* at 315.]

As may be seen from the exhaustive chronicling of the multifold authorities throughout the nation by the Iowa Supreme Court in *State v. Williams,* 285 N.W.2d 248, 256-60 (Iowa 1979) (appeal from retrial following *Brewer v. Williams,* 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977)), the doctrine, although we have been presented with no previous occasion to consider it, has met with near universal acceptance, including that of the intermediate appellate court of this State, *see Bartram v. State,* 33 Md. App. 115, 168-173, 364 A.2d 1119, 1149-1152 (1976), *aff'd,* 280 Md. 616 (1977); *Cook v. State,* 8 Md. App. 243, 258-59, 259 A.2d 326, 334-335 (1969); *Duckett v. State,* 3 Md. App. 563, 577, 240 A.2d 332, 341 (1967) (dicta). However, for reasons we will state presently, we are not required here to

definitively decide whether the doctrine should be embraced and applied in this State. Even though, generally speaking, the constitutional legitimacy of the doctrine of inevitable discovery as well as the basic requisites of this tenet are established, courts do not always agree on the manner of its application.[4] In the matter before us, however, we need not venture beyond recognition of the existence of the inevitable discovery doctrine and its basic requirements, nor need we analyze any of its numerous ramifications and nuances, for, in this case, the State has failed to meet even the most minimal requirements of that doctrine. Although the prosecution, seeking to invoke inevitable discovery, bears the burden of establishing the admissibility of otherwise tainted evidence, *Everhart v. State,* 274 Md. 459, 482, 337 A.2d 100, 113 (1975), the state's attorney here made no effort in the trial court to demonstrate compliance with either prerequisite to admissibility under this exception to the exclusionary rule. It is true that the State avows in this Court that the police, absent Stokes' statement, "would" have searched the ceiling above petitioner's bedroom. This unsupported assertion, however, is no substitute for evidentiary proof. The prosecution produced no evidence tending to show that a predictable police procedure existed

---

4. For example, there are several formulations of the requisite standard of proof to be applied when an exception to the exclusionary rule is asserted. *Compare* United States v. Cales, 493 F.2d 1215, 1216 (9th Cir. 1974) (preponderance of evidence) *with* Government of Virgin Islands v. Gereau, 502 F.2d 914, 927 (3rd Cir. 1974) (clear and convincing), *cert. denied,* 420 U.S. 909 (1975) *with* United States v. Schipani, 289 F. Supp. 43 (E.D.N.Y. 1968), *aff'd,* 414 F.2d 1262 (2nd Cir. 1969) (beyond a reasonable doubt). Courts applying the inevitable discovery doctrine also differ over whether it may ever be used to untaint " 'primary' evidence, that evidence flowing immediately from the illegality," since the doctrine is most frequently applied to " 'secondary' evidence, that evidence derived from illegally obtained primary evidence." LaCount and Girese, *The "Inevitable Discovery" Rule, an Evolving Exception to the Constitutional Exclusionary Rule,* 40 Alb. L. Rev. 483, 506-509 (1976). In this regard, *compare* State v. Crossen, 21 Or. App. 835, 536 P.2d 1263 (1975) (inevitable discovery does not apply to primary evidence) *with* Clough v. State, 92 Nev. 603, 555 P.2d 840 (1976) (doctrine of inevitable discovery applied to primary evidence without discussion). Other courts, in an effort to prevent the inevitable discovery doctrine from encouraging "end runs and shortcuts," have placed an additional burden on the prosecution. These courts require demonstration that the police did not act in bad faith to hasten discovery of the challenged evidence. See State v. Williams, 285 N.W.2d 248 (Iowa 1979).

for inspection of the room which would have resulted in the discovery of the illegal narcotics. It is now on appeal too late to speculate about what procedures the police utilize when executing a search warrant for illegal narcotics, and, if they exist, to further speculate whether following those prescribed procedures would have revealed the location of the drugs. Moreover, even if there were evidence indicating the existence of procedures to be followed, we cannot infer that the police officers here, who had abandoned their quest in favor of quizzing Stokes, would have, when that tack failed, pursued an additional search into the ceiling of the bedroom. Thus, the State has not met the basic requirement that it demonstrate by competent evidence that there was a prescribed and utilized department procedure which would have, in fact, absent the illegally obtained assistance from Stokes, uncovered the disputed evidence.

Consequently, the judgment of the Court of Special Appeals affirming the conviction and sentence must be reversed. In reversing on an evidentiary point, we would ordinarily direct remanding of the cause to the trial court for a new trial, but since it appears to us evident (and the State does not suggest otherwise) that there can be no valid conviction here without the illegally obtained statement and heroin, we this time will reverse without authorizing a new trial.

> *Judgment of the Court of Special Appeals reversed, and cause remanded to that court with instructions that it reverse the judgment of the Criminal Court of Baltimore, without a new trial.*
>
> *Costs to be paid by the Mayor and City Council of Baltimore.*